## THE NEW ORLEANS DRAINING COMPANY PRAYING FOR THE CONFIRMATION OF A TABLEAU.*

The power of the legislative department of the government is supreme, except where restricted by the Constitution.

The Legislature has the power to drain the swamps in the rear of the city of New Orleans, directly, or by its own agents, and so it has the power to drain them through the intervention of a company created for that purpose.

Article 124 of the Constitution, guarranteeing to the city of New Orleans the election of its own officers, was not intended to direct the manner in which contractors for works of public improvement should be selected, nor to abrogate contracts already made. It is the right of appointing the several *public* officers necessary for the administration of the police of the city that is secured to the citizens of New Orleans. The kind of officers intended is shown by the proviso to Article 124. An incorporated company taking a contract for the draining of a swamp cannot be called a public officer necessary for the administration of the police of the city.

It was within the power of the Legislature to require the proprietors of the marshy lands in the rear of the city themselves to drain them. It had the power also for sufficient causes, of which the Legislature alone was the judge, to cause the work to be done and charged to the proprietors respectively, and all this would not be the levying of a tax in the sense of that word as used in the Constitution. The money was not intended to go into the treasury, and become subject to the rules, by which alone it could be appropriated annually.

The property drained has been benefited in amount greater than the cost of the assessed work. Were not this the case, the property of each proprietor, to the extent of the difference between the increased value and the cost of the work assessed to him, would be taken for a purpose of publi utility without adequate compensation previously made, and consequently there would be a violation of the provisions of Article 105 of the Constitution.

Under the charter the estimate that the company was required to make of the probable cost of the work, did not limit the lien to the amount of the estimate, should the cost of the work exceed the estimate.

It is in the power of the Legislature to determine in what manner parties are to be brought into court.

If the estimate of the cost of the work was irregular, such irregularity has been cured by a judgment of a competent tribunal, which has not only become final, but has been acquiesced in by the parties, who daily saw the work upon their land in progress, and who made no objection or remonstrance.

By the charter of the company the cost of drainage was levied, not as a personal tax upon the individual proprietor, but as an assessment against the property benefited by the labor of the company, and to repay the company, not to go into the public coffers. And for the benefit which it was supposed the city would derive in point of salubrity from the improvement, the municipalities were required to keep the draining machinery in perpetual operation, without any extra tax on the lands. SPOFFORD, J.

All the rights of the company were acquired under the Constitution of 1812; these were reserved by the schedules of the Constitutions of 1845 and 1852, so that the clauses in the Constitutions of 1845 and 1852, which are not to be found in the Constitution of 1812, touching "vested rights" and the "equality and uniformity of taxation," can have no bearing upon these rights. SPOFFORD, J.

To go behind the Constitution of the State and of the United States, in search of an unwritten bill of rights, which is said to lie at the foundation of every free government, and there to find a principle on which the legislation in question may be declared null and void, would be to prostrate the plainly declared will of a co-ordinate department of the government, not because it contravenes

---

* By certain Acts of the Legislature, the New Orleans Draining Company was incorporated. The object of the incorporation was to enable the Company to drain the swamp lands in the rear of the city of New Orleans. A lien was created by the charter upon the lands drained, to pay the costs, etc., of the drainage. The present proceeding was to establish the lien, and to recover the costs of expenses of the drainage, etc. The Acts of the Legislature under which the Company claimed will be found very much at large in the opinions rendered by the several Judges.

When the case was first heard in the Supreme Court, Mr. Justice BUCHANAN pronounced the judgment of the court, Mr. Justice SPOFFORD dissenting, and Chief Justice SLIDELL recusing himself, having an interest in the cause. There was an application for a rehearing, and pending the application Chief Justice SLIDELL and Mr. Justice OGDEN resigned their seats upon the bench, and MERRICK, C. J., and LEA, J., were elected in their places respectively. A rehearing having been granted, MERRICK, C. J., delivered the opinion of the court, all the Judges concurring in the decree, with the exception of BUCHANAN, J., who adhered to the opinion previously pronounced by him as the organ of the court.

any provision of the organic law, which the court is to expound, and all are to obey, but because it contradicts the notions of justice that the court may entertain. SPOFFORD, J.

Perhaps the court has such a power; like the right of revolution, it is sometimes obscurely hinted at in judicial opinions. Conceding that the court has the power to protect the citizen against encroachments from the legislative power which are not specially, or by necessary implication, inhibited by the Constitution, it is obvious that a flagrant case of wrong and hardship should be made out to justify a judicial tribunal in thwarting the legislative will, without a direct warrant for doing so to be found in the Constitution itself. SPOFFORD, J.

The charter of the New Orleans Draining Company is unconstitutional in this, that it levies a tax only upon the owners of the property drained, for an improvement intended for the benefit of the whole city of New Orleans, and so declared to be in the preamble to the charter. BUCHANAN, J., dissenting.

The power conferred upon the Draining Company by the Act of 1839 is a power of taxation, which it is unconstitutional for the Legislature to delegate to a joint stock company, and is inconsistent with the taxing power vested in the Municipal Corporation by the various Acts incorporating the city of New Orleans, which are not repealed. BUCHANAN, J., dissenting.

The inscription of a mortgage and privilege for an undefined amount, in favor of the Draining Company, against each and every proprietor of land embraced within the company's operations, seems to be a divestiture of vested rights, because it must render all property thus situated unsaleable in the interval between the inscription of the decree creating the mortgage and privilege before the work is undertaken, and the homologation of the assessment and tableau of contribution after the work is completed. BUCHANAN, J., dissenting.

The superiority which is given by the Act of 1839 to the mortgage and privilege of the company on the lands embraced in their operations, over all mortgages, conventional, legal, or judicial, is a provision divesting vested rights and impairing the obligation of contracts. BUCHANAN, J., dissenting.

APPEAL from the Third District Court of New Orleans, *Kennedy, J.*

*Roselius* and *Janin,* for the Draining Company. *Eustis, Morel, Strawbridge* and *Bryon,* for opponents and appellants.

BUCHANAN, J. (SPOFFORD, J., dissenting.) Of the many oppositions filed herein, sixteen have called in question the constitutionality of the charter of the New Orleans Draining Company.

The points of unconstitutionality urged, may be reduced to four, namely :

1. The charter taxes a portion of the community only, for a work beneficial to the public at large; which is against the principle of equality and uniformity in taxation, consecrated by Article 127 of the Constitution of 1845, and Article 123 of that of 1852.

2. The charter divests vested rights, without an adequate compensation previously made, contrary to Article 109 of the Constitution of 1845, and Article 105 of that of 1852.

3. It delegates the taxing power to a private corporation, which the Legislature had not the constitutional power to do.

4. It delegates the administration and police of a portion of the territory comprised within the limits of the political or municipal corporation of New Orleans, to a private corporation, in violation of section 23 of the 6th Article of the Constitution of 1812, which was repeated verbatim in the 128th Article of the Constitution of 1845, and the 124th Article of that of 1852.

Of these points, it is only necessary to examine the first. Tested by the doctrine of the majority of this court, in the Benton street case, 9th An. 444, it must prevail.

The New Orleans Draining Company was incorporated by Act of the Legislature of 19th of March, 1835. An unusually full preamble leaves no doubt of the motives which actuated the Legislature in granting this charter; and as those motives have an important bearing upon the constitutional question under examination, we will here transcribe the preamble in full :

"Whereas, in accordance with the opinion of physicians of the greatest experience, it appears that the epidemics which, with few exceptions, have annually prevailed in the city of New Orleans and its faubourgs, are in general to be attributed to two causes, intense heat and excessive humidity, which, when combined, frequently produce the most fatal diseases; and although the limited powers of man cannot obviate or control the first, yet he may mitigate its virulence, by adopting such means as will effect a free circulation of air; and the latter would be in a great measure, if not entirely, removed by draining off the stagnant waters which accumulate on the low and marshy grounds. And whereas, after the draining of the said grounds shall have been accomplished, if the woods which at present mostly cover the entire space between Lake Pontchartrain and the said city and faubourgs, be cut down and removed, it is more than probable that the salubrious breezes from the said lake, will be felt to the banks of the Mississippi, and after passing over a well drained surface, reach the city, free from those exhalations which are now brought thither by winds blowing from that quarter, vitiating the atmosphere and proving fatal to human life. And whereas, the improvements aforesaid form an object of serious importance, not only to the inhabitants of the said city and faubourgs, but also to those of every other section of the State, as their inevitable results would be the increase of population, and the general prosperity thereof. And whereas, so desirable an object can only be effected through the medium of a large capital, in consequence of the great number of workmen required, and the immense expenses necessarily attending the undertaking thereof, and which the proprietors of the soil may want either the means or the inclination to provide for the same, particularly as the success of an enterprise of this nature chiefly depends upon the preparation and adoption of a judicious plan of well combined operations, on which it might be impossible for them to agree. And whereas, it being a well established maxim among all civilized nations, that the welfare of society always takes precedence of the interests or the will of individuals, should it conflict with the same.; hence, it becomes the duty of those to whom the legislative power is confided, to prescribe and adopt the most efficient measures for the accomplishment of so important an object."

For these considerations, a company was created by the statute, with the style of the New Orleans Draining Company, with a capital stock to be raised by subscription, whose duty it should be to drain, fill up and improve, all that portion of the incorporated limits of the city of New Orleans, which were not then drained and improved; which comprised perhaps three-fourths of the superficial extent of the territory of that corporation as defined by law. The *modus operandi* of the Draining Company, in effecting these improvements, was minutely detailed in the charter, but has been since essentially changed by an amendatory statute passed the 20th of March, 1839. By the provisions of the last mentioned act, the company was authorized to clear and drain the land by sections, taking an accurate account of all the expenses incurred, hire of laborers, and salaries of officers, and by means of Assessors appointed by themselves to apportion the whole of the said charges among the proprietors of the land comprised within the section thus cleared and drained. For the security of their payment, a mortgage of the first class, superior to all other claims or liens upon the land, was granted to the company; and the most summary process for the collection of the assessment from each proprietor of the land.

As in the case of the Act of 1832, for the opening and widening of streets in the city of New Orleans, the assessment upon the individual proprietors of land, goes through the formality of a judicial inquiry and a judgment of homologation; but this does not change its character of a tax or impost, paid by the proprietors of the section drained, to defray expenses incurred for the benefit of the whole community.

<span style="float:right">DRAINING CO. PRAYING, &C.</span>

That the work has been done for the public benefit, the preamble of the Act of 1835, and the 13th section of the Act of 1839, prohibit the company from disputing. This being the case, it is unconstitutional to charge the proprietors of the land drained with all the expenses of drainage. It strikes us as entirely inadmissible, to permit the company, in the face of the declarations of the preamble and the whole tenor of the charter, original and amended, to assume the quality of *negotiorum gestor* of the proprietors embraced in their assessment roll. The *negotiorum gestor* is one who does the business of another without an authorization. But whose business has the Draining Company done? The business of the State, who had given it the most formal authority, and the business of the city, which it was preserving from pestilence by its operations, at the same time that it was increasing her population and resources. The relation of the company to the proprietors of the land, is not that of an agent, but of a creditor—a creditor of the most favored and peremptory kind—who is equally independent of the insolvent court, and of the court of probates.

It should be observed, that the stock of the Draining Company is owned almost entirely by the State and the city, and has been paid for in city and State bonds. With the proceeds of these, the company has done the work which is the subject of this tableau. In rejecting the claim against the proprietors of the land drained, that charge falls where it properly belongs—upon the taxpayers of the city and State at large.

Judgment of the District Court reversed; and it is decreed that these proceedings be dismissed; the costs in both courts to be paid by the New Orleans Draining Company.

OGDEN, J. The suit being one, based entirely on the authority which the Draining Company claim to have derived from the Acts of the Legislature, which are, in my opinion, unconstitutional, I therefore concur in the judgment pronounced by Mr. Justice BUCHANAN, dismissing the proceedings, without thinking it necessary to express any opinion as to the right of the plaintiffs to recover, in an equitable action, the amount to which the defendants have been benefited by the work and labor done in the improvement of their property.

SPOFFORD, J., dissenting. By an Act entitled "an Act to provide for the draining and clearing of the Marshy Grounds and Cypress Swamps, situated between the city of New Orleans, its incorporated suburbs and Lake Pontchartrain," the Legislature of Louisiana, on the 19th of March, 1835, incorporated the "New Orleans Draining Company."

The provisions of that Act were numerous and complicated, and although the company went into operation under it, some of its requisitions were found to be impracticable.

Another Act was, therefore, passed and approved, on the 20th of March, 1839, of which the following are the material sections:

## AN ACT

To amend an Act, entitled "an Act to provide for the draining and clearing of the Marshy Grounds and Cypress Swamps, situated between the city of

New Orleans, its incorporated suburbs, and Lake Ponchartrain," approved 19th March, 1835.

Whereas, the draining of the low and marshy grounds behind the First Municipality of the city of New Orleans, by the Draining Company, has proved completely successful; whereas, similar experiments made by private citizens on their plantations, on the Mississippi, have been attended with the same beneficial results, whereby the practicability and utility of the system of draining, lately adopted in this State, has been fully and satisfactorily tested: but, whereas, difficulties are found to exist in the execution of several provisions of the Act incorporating the said Draining Company, and it is desirable to simplify, (expedite and extend the operations of the said Company,) therefore:

Section 1. Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened, That the New Orleans Draining Company shall have the right to proceed to drain the lands embraced within the limits designated in the Act to which this is an amendment, and to be compensated, therefor, in the following manner: whenever the said Draining Company is prepared to drain a portion of land, which shall conveniently form a separate section, it shall have a plan thereof made, accurately designating the limits of the said section, and as much as possible the subdivision of the property therein contained, and the names of the proprietors, and also the dimensions and direction of the canals intended to be dug, and the place where the steam engine, if any, will be established. The plan shall be deposited in the office of a notary public, in the city of New Orleans, and a notice shall be inserted in French and English, in two newspapers printed in the city of New Orleans, at least once a week during four weeks in succession, announcing that the company will proceed to drain the said section, describing the place where the plan thereof is deposited, accurately defining the limits thereof, and indicating as nearly as possible, the time within which the draing thereof will be completed, and the probable cost of said works. After said publications, the said Company will apply by petition to the Court of the First Judicial District, or at its option, to the Parish Court of the parish of Orleans, if the section is entirely situated in the parish of Orleans, which court, upon proof being made that the said advertisements were regularly published, shall decree that each portion of the property, situated within the said limits, is subject to a first mortgage and privilege in favor of the said Draining Company, for such amount, as may be assessed on it for its proportion of the whole cost of the draining of the said section. The said decree shall be recorded in the office of Recorder of Mortgages of the parish or parishes wherein the section is situated, and a copy of the aforesaid plan shall also be deposited in the said office or offices, for the information of the said Recorder of Mortgages. The said Recorder shall be entitled to twenty dollars for the recording of the said decree, and the deposit of said plan; and if he is required by the said company to record the said decree in the name of any or all the proprietors of the said section, he shall be entitled to receive fifty cents for the special recording in the name of any proprietor, whose name, and the description of whose property is furnished to him; and, whenever the said Recorder of Mortgages is required to deliver a certificate of mortgages of any property embraced within the said section, he shall mention thereon that the said property is subject to a privilege and first mortgage in favor of the said Draining Company, for such sum of money as will hereafter be assessed on said property for the draining thereof. The said privilege and first mortgage shall take precedence over all mortgages whatsoever, whether conventional, tacit, legal, or judicial, and shall attach to said property, until the amount which will be assessed on it, and the notes which may be given for said amount, as provided in the 5th, 6th, 7th and 8th sections of this Act, shall have been paid in full.

Sec. 2. Be it further enacted, &c., That the said Draining Company shall, thereafter, proceed to the draining of the said section with all possible expedition, and complete it as much as practicable, before the draining of any other section is commenced. The said company shall open an account for the said section, and charge it with all the expenses incurred for the draining thereof, including the amount of the contracts paid therefor, the machinery, damages paid, the labor of its slaves, at the rate of $30 per month, for each slave, and the salaries of its officers, for the time during which the company

is exclusively occupied with the draining of the said section. If other works of the company shall be progressing at the same time, only a ratable proportion of the said salaries shall be charged to the said section, and the same ratable distribution shall also take place, whenever the machinery or other works established on one section shall be used at the same time for the draining of another section ; and on every charge in the said account, interest shall be calculated at the rate of ten per centum per annum from the time it is made.

Sec. 3. Be it further enacted, &c., That as soon as the draining of the said section is completed, the said company shall make out and close a general account of all the expenses charged to the same, as aforesaid ; and shall then appoint three Appraisers, who shall be sworn, faithfully, and to the best of their skill and judgment, to perform the duties assigned to them by this Act. The said Appraisers shall define the limits within which property lying in the section, is to be charged for the draining of the section ; they shall then assess on each individual property, such portion of the amount of the aforesaid account of the Draining Company, as will appear to them in due proportion, in such a manner that the amount of their assessment will be equal to the amount of said account. In making this distribution, the said Appraisers will principally take into consideration the extent of the said individual properties; and they shall also assess property which might be above the level of ordinary inundations, if, in their opinion, it became more easily accessible and cultivable, or habitable by the means of the said draining ; they shall have a plan made, if the plan made before the said assessment should not be sufficiently detailed, and prepare a tableau setting forth the names of the proprietors, the extent of their property and the amount with which it is charged, and accompany the said tableau with such observations as circumstances may seem to them to require. The said plan or plans shall be paid for by the said company, and for the said assessment and tableau the said company may allow to the said Appraisers a compensation not exceeding three hundred dollars, which several expenses will also be included in the account of the said section, together with those incurred for judicial proceedings on account of the said section : the said tableau shall then be deposited by the said Draining Company, with the clerk of the court which rendered the decree, described in the first section, together with a copy of the detailed account of the said section, for the inspection of whomsoever it may concern. The said Draining Company shall then give notice by advertisements, printed at least three times, within fifteen days after the first notice, in French and English, in two newspapers published in the city of New Orleans, of the day on which the said tableau will be filed for confirmation in the said court, which day shall not be less than twenty days later than the day of the said first notice. · Any person, whose interests may be affected by the said tableau and assessment, may then specially state his objections to the same, in writing, and deposit them with the clerk within five days before the day on which the said tableau is to be filed for confir· mation ; if the said objections shall appear well founded to the said Appraisers, they shall amend their said tableau, and the tableau so amended, or the original tableau, if no amendment should have been made, shall be filed for confirmation. In all matters made the duty of the said Appraiser by this section, a majority of them may act, and in case of the death, or resignation, or departure of any of them, they may be replaced by the said Draining Company. Within ten days, and no more after the the filing of said tableau for confirmation, any person, whose interests may be affected thereby, may file his opposition thereto, which shall be heard by the said court, by rule or order, whereafter the said court shall either confirm the said tableau, or order it to be amended within a delay to be fixed, and then homologate and confirm it, if it has been amended according to the judgment of the said court.

Sec. 4. Be it further enacted, &c., That, whereas, by proceeding under this Act, the said Draining Company is only reimbursed for its outlays with interest, and bears the risk of the loss of its slaves, and other property—and, whereas, it is important that its operations should not be arrested by delays in the payments of the amounts due by the proprietors of the lands drained, the amounts charged in the said tableau as confirmed, shall be payable and may be required of them ; although they, or any of them, or the said Draining Company shall appeal from the said judgment of confirmation, and in case of the reversal of the said judgment on appeal, they shall either be refunded

what they have paid too much, or be liable to pay an additional amount, if by judgment of the Supreme Court, the tableau should be amended or altered, as to charge them with a greater amount than that for which they were carried on the original tableau, as confirmed by the court of original jurisdiction.

Sec. 5.   Be it further enacted, &c., That the amount due upon each property for the draining thereof, as settled by the said confirmed tableau, shall be payable in cash with ten per cent. interest from the day at which the aforesaid account of the Draining Company shall have been closed.   But if the amount to be paid by any individual proprietor, shall exceed the sum of one hundred dollars, he shall be at liberty to give his notes thereof to the order of said company, payable at one and two years from the date of the said account with ten per cent. interest from the said date, and also bearing ten per cent. interest from maturity, if not then punctually paid.   And in order more fully to secure the payment of the said notes, the drawer thereof shall execute a special mortgage in favor of the said company on the property drained, or on such portion thereof as to the said company may appear sufficient, and the said notes shall be identified with the said mortgage.   The payment of the said mortgage shall be assumed by any subsequent purchasers of the said property, and shall not be extinguished by any insolvent proceedings, or by any sale made by virtue of an order of a Court of Probates.   The said mortgage shall hold the same privileged rank as the mortgage provided for in the first section, and shall be considered as identical with the same and not as a novation thereof.   In case of the non-payment of any of the said notes at maturity, the said company shall have the right of suing on its said mortgage and privilege, by order of seizure and sale, which right of said company shall not be impaired, or in any manner affected by any subdivision, forced or voluntary sale of the said property, respite, cession of property, or transmission of said property by death or otherwise.   The said proceedings may be either directed against the said property or the drawers of the said notes.   The property mortgaged, or so much thereof as may to the said company appear sufficient to pay its claim, shall be sold for cash without appraisement; if both the said notes are overdue, or in case the second of the said notes be not yet due, then the said property shall be sold for an amount sufficient to pay the first of the said notes with interest and costs of protest and the costs of suit, the purchaser moreover binding himself to pay the second of the said notes at maturity.   In either case the balance of the price, if any, shall not be payable in cash, but shall remain in the hands of the purchaser, secured by a special mortgage, and be subject to the claims of the former proprietor of the said lands, or of the person or persons who may have a mortgage on said lands.

Sec. 6.   Be it further enacted, &c., That the notes and mortgages mentioned in the foregoing section, shall be given by the same persons who, by the 17th section of the Act to which this is an amendment, are authorized to enter into contracts with the said Draining Company, and shall be binding upon the persons represented by them in the same manner as the contracts made by them in virtue of the said section would be.

Sec. 7.   Be it further enacted, &c., That if, within thirty days after the said Draining Company shall have given notice in French and English, in two newspapers printed in the city of New Orleans, that the tableau has been confirmed by the court of original jurisdiction in which it was filed, and shall in said notice have called on the proprietors of the said land included in the said section, to settle for the amount due on their said property, the said proprietors or their legal representatives shall not have effected the said settlement, either by paying the amount due or by furnishing notes and mortgages as provided for in the fifth and sixth sections, it shall be lawful for the said Draining Company to proceed by order of seizure and sale against the property for which no settlement may have been made.   The said company shall be entitled to the said order of seizure and sale by merely exhibiting the certificate of the Recorder of Mortgages, showing that a judgment creating a mortgage and privilege on the section, and described in the first section, was duly recorded, and also the confirmed tableau on which the said property was assessed, and copies of the newspapers in which the notice prescribed in this section was inserted. These proceedings may be directed either against the person or persons who may then be owners of the said property, or against the person or persons who were the owners thereof at the time when the aforesaid judgment creating the

mortgage was recorded; and the fact of said ownership shall be established either by a copy of the Act or judicial proceeding by which the said property was acquired, or by the affidavits of two witnesses annexed to the petition. If the said Draining Company should, notwithstanding diligent enquiry, not be able to ascertain who are the owners of any piece of property for whi h a settlement is to be made as aforesaid, or who were the owners thereof at the time the judgment mentioned in the first section was recorded in the Office of Mortgages, said company shall publish an advertisement in French and English in two newspapers printed in the city of New Orleans, which advertisement shall appear at least three times during fifteen days, and shall contain a clear description of the property referred t), and set forth that the said property has been assessed for the draining thereof, on a tableau confirmed by a competent tribunal, that the owners thereof are unknown to the said company, and that if the said owners do not make themselves known within twenty days from the date of the first insertion of the said advertisement, the said property will be proceeded against as belonging to absent or unknown persons: if, within the said delay, the said owners have not made themselves or become known to the said company, the said company shall be entitled to obtain an order of seizure and sale against the said property on exhibiting the certificate of the Recorder of Mortgages mentioned in this section, and the confirmed tableau, and on proving that the said advertisements were regularly published, which proof may be made by production of copies of the newspapers in which the said advertisements were published. The said company shall then move the court to appoint an attorney to represent the unknown owner of the said property, and the notice of seizure shall be served on the said attorney. In either of the cases provided for in this section, the sale shall be made in the same manner as is indicated in the fifth section, and the price shall be made payable at the same time or times at which the mortgage notes of the owners of the property would have fallen due, if he had furnished said notes.

Sec. 8. Be it further enacted, &c., That on receiving from any of the proprietors the notes and special mortgage mentioned in the fifth section, the said Draining Company shall raise the mortgage resulting from the recording of the judgment confirming the tableau, as provided in the fourth section, in which case the mortgage resulting from the said judgment shall be raised to the amount of the said notes only, and shall still remain in force to secure the payment of any additional amount which the person so furnishing his notes, may have to pay, in consequence of any judgment which may be rendered by the Supreme Court; but the said company shall, at all times, be at liberty to raise the mortgage resulting from the judgment described in the first section, in toto, if it can make a different and satisfactory settlement with an individual proprietor for securing the whole amount to be paid by him.

Sec. 9. Be it further enacted, &c., That if any property drained by the said company shall be in suit or claimed by different persons, and neither of the said claimants shall be willing to pay the amount assessed thereon, or to settle therefor by giving his notes and a mortgage, as provided by the fifth section, the company shall proceed against the said property, and against the different claimants thereof, jointly, as far as may be known to the said company, by order of seizure and sale, in the same manner as is provided in the fifth section, in doing which the said company shall as much as possible, separate the property in contestation from the property which is not in contestation; and the balance of the price, if any, over and above the amount due to the said Draining Company, and the costs of proceeding, shall remain in the hands of the purchasers, be secured by a special mortgage, and be subject to the rights of the persons who claimed the said land previous to the sale thereof, or who had mortgaged thereon. If any person who furnished his notes and a mortgage for the amount due for the draining of the land claimed by him, as provided in the fifth section, should thereafter be evicted from the said land by a judgment of the Supreme Court, or by a final judgment of original jurisdiction not appealed from, before the said notes or any of them shall fall due, he shall not be personally responsible for the payment at its or their maturity, unless the same shall have been discounted by the said Draining Company; and the person or persons who may have recovered the said lands and the subsequent purchasers of the lands shall be responsible for the payment of said note or notes, and the mortgage given to secure them may be proceeded on in

44

DRAINING CO.
PRAYING, &C.

the same manner as is provided in the fifth section: and if any person who has paid any amount for the draining of land claimed by him in conformity with the provisions of this Act, should thereafter be evicted therefrom, he shall be entitled to claim from the persons succeeding in the said suit the amount so paid by him, with ten per cent. interest from the time of the institution of said suit.

Sec. 10. Be it further enacted, &c., That the said company shall clear, and cause the wood to be cut as much as possible to the level of the ground on any land which it may have drained, and dispose of the same to the best advantage for account of the proprietors of the said wooded land; and the said wooded portions of the land drained by the said company shall be ratably charged in the account and tableau described in the third section, for the expenses incurred for cutting, removing and selling the said wood, and be credited with the proceeds thereof; and nothing in this Act, or in the Act to which this is an amendment, shall be so construed as to render it obligatory upon the said Draining Company to fill up and raise any land which it may undertake to drain.

Sec. 11. Be it further enacted, &c., That the damages which the said company may be bound to pay, as provided in the twentieth section of the Act to which this is an amendment, shall be estimated by three appraisers, one of whom shall be appointed by the Governor, one by the Mayor of the city of New Orleans, and one by the Board of Directors of the Draining Company, and each of them shall remain in office during one year, or until his successor is appointed; and the said appraisers shall take an oath well and truly, and to the best of their skill and judgment, to perform the duties assigned to them by this Act, and by the twentieth section of the Act to which this is an amendment.

\*          \*          \*          \*          \*          \*

Sec. 13. Be it further enacted, &c., That whenever any section of land shall have been drained and cleared by the said Draining Company, it shall abandon the same to the Municipality or Municipalities in which the said section may be situated; and whereas the said draining will have been effected entirely at the expense of the proprietors of said land, and will greatly contribute to the salubrity and drainage of the front part of the said city, the said Municipality or Municipalities shall thereafter maintain the ditches and levees made by the said Draining Company, and the machinery and other works erected by the same on the said sections, in good repair and efficient condition, without ever laying an extra tax on the lands so drained. If any of the said sections should extend into two Municipalities, the steam engine and other machinery erected thereon by the said Draining Company, shall be kept in repair and operation by the Municipality within the limits of which it is established; but the other Municipality shall contribute to the expenses thereby occasioned, in the same proportion which the extent of the portion of the said section lying within the limits bears to the extent of the portion of the said section embraced within the boundaries of the Municipality wherein the said steam engine or other machinery and building have been constructed; but each Municipality shall maintain the ditches and levees made by said company within its own limits.

And the 20th section of the original Act, alluded to in the 10th section of the amendatory Act, provides as follows:

Sec. 20. Be it further enacted, &c., That for all lands taken for the works of the company, such as canals, drains, basins, roads, streets, and other necessary works, the said company shall be bound to pay the value thereof to the owners, to be ascertained by the appraisers appointed under this Act, and in all cases the estimate is to be based on the value of the land in its primitive state, without improvement; and that, if there should be any portion of land within any of the sections aforesaid which the company shall not have drained, the said company shall have no claim whatever against the owner of the land for any moneys or labor expended on the part of the land unreclaimed.

It will be observed, by inspecting the foregoing provisions, that the Draining Company was required to keep an account for each section of land it undertook to drain, to charge against it all the expenses incurred, with 10 per cent. interest, for the reimbursement of which all the land within the section was, upon compliance with certain pre-requisites, to be bound by mortgage, and in default of payment, a proceeding *in rem* was given against the property drained for each defaulting proprietor.

The cost of drainage was thus levied, not as a personal tax upon the individual proprietor, but as an assessment against the property benefited by the labor of the company, and to repay the company, not to go into the public coffers. And for the benefit which it was supposed the city would derive in point of salubrity from the improvement, the Municipalities were required to keep the draining machinery in perpetual operation, without laying any extra tax upon the lands.

Under its amended charter, the company undertook, in the fall of the year 1845, to drain what was styled Section No. 2, consisting of about 2000 acres, back of the city proper, bounded in front by Claiborne, St. Marc and Magnolia streets, in the rear by the Metairie Road, on the upper side by the canal of the Canal and Banking Company, and on the lower side by the Metairie Road, the Bayou St. John and the Canal Carondelet.

Out of the company's demand for compensation for this work the present controversies have grown.

Claiming to have complied, so far as it was possible, with the injunctions of its charter, the company presented to the Third District Court a tableau of assessments against section number two, amounting in all, principal and interest, to the sum of $326,000.

After advertisement, according to law, a large number of proprietors appeared, and filed separate oppositions to the confirmation of the tableau, upon very numerous grounds.

The greater number of the opponents, however, confined their opposition to alleged informalities in the proceedings of the company, as not being in conformity with the requisitions of its charter, to specific items of the account as being overcharged or incurred by reason of the company's culpable remissness and extravagance, and to the basis of assessment, which was declared by some of the opponents to operate unequally.

All these oppositions tended simply to the reduction of the claims of the company.

But some of the opponents took a broader ground, and resisted the right of the company to claim anything for the labor bestowed upon their lands because, as they asserted, the Acts of the 19th March, 1835, and the 20th March, 1839, creating the company and defining its powers, duties and rights, were unconstitutional and void.

After a protracted trial, the District Judge overruled the objections to the constitutionality of the legislative Acts in question, but sustained some of the oppositions in part, so as to reduce the total claim of the company nearly $100,000, confirming the tableau for the balance.

The company has appealed, and complains of this reduction as erroneous; numerous opponents have joined in the appeal, and have renewed in this court all the controversies which were waged in the court below.

I. It is urged by some of the proprietors that the Acts in question are void, because they are in contravention of Section 10, Article 1 of the Constitution of the United States, which, among other things, declares that "no State shall pass any law impairing the obligation of contracts."

In support of this position, they adduced in evidence their titles from the former proprietors, asserting them to be contracts, the obligation of which is impaired by the charter of the Draining Company.

I find no clause in either of the legislative Acts referred to which infringes, in the slightest degree, the mutual rights and obligations of the vendors and vendees. The contract is left intact.

The case of *Fletcher.* v. *Peck*, 6 Cranch, is very far from being analogous. There the Legislature itself was a party to the contract, and occupied the position of vendor in an act of sale.

A subsequent Legislature declared the contract null, and attempted to divest the title of the vendees and reinvest it in the State.

The very case contemplated by the framers of the Constitution of the United States had arisen, and the paramount authority óf that instrument was vindicated by the decision of the supreme federal tribunal.

II. I do not see how the Acts of 1835 and 1839 are invalidated by that provision in Section 4, Article IV, which binds the United States to guarantee to each State in this Union a republican form of government.

III. By Section 23, Art. VI of the State Constitution of 1812, under the dominion of which the Draining Company was chartered, and its rights vested, it was provided that " the citizens of the town of New Orleans shall have the right of appointing the several public officers necessary for the administration and the police of the said city pursuant to the mode of election which shall be prescribed by the Legislature." It is urged that if the right to drain the lands compulsorily existed at all, it was a measure of police, and was thus confided exclusively to the city of New Orleans.

The citizens of New Orleans have not been deprived by these Acts of any of their rights with regard to the election of public officers thus guaranteed to them. Indeed it is difficult to perceive the force of this objection on the part of the proprietors, when we consider that the city itself is the owner of nearly seven-ninths of the stock of the Draining Company, and acquiesces in the constitutionality and binding force of the acts.

I have said that the rights of the company, as against these lands, vested under the Constitution of 1812. For, before the adoption of the Constitution of 1845, the stock had been taken upon the faith of the charter, ($350,000 by the city of New Orleans, $50,000 by the State, and $53,000 by individuals,) the machinery had been purchased, the preliminary outlays made, the plan of the drainage section drawn, and the decree procured and recorded subjecting the lands to a first mortgage and ·privilege in favor of the company, which it is now seeking to enforce. The rights of the company were reserved by the schedule of the Constitution of 1845, Art. 142, (as well as that of 1852, Art. 143,) which provided that " all rights, actions, prosecutions, claims and contracts, as well of individuals as of bodies corporate," shall continue as if the new Constitution had not been adopted.

It therefore becomes unnecessary, in my judgment, to inquire what effect the new features touching " vested rights," and the " equality and uniformity of taxation," introduced for the first time in this State by the Constitution of 1845, (and preserved in that of 1852) might have had upon the rights of the company, if they had not been thus solemnly guarded through all the changes of the fundamental law.

I cannot believe, after reading the opinion in the case of *Le Breton* v. *Morgan,* 4 N. S., 139, that there is anything in this charter obnoxious to the provisions of the Constitution of 1812.

And I find no article either in the national or State Constitutions applicable to the present case, which annuls the claim of the company to reimbursement out of the lands.

But we have been asked to go behind these Constitutions in search of an un-

written bill of rights, which is said to lie at the foundation of every free govern-
ment, and there to find a principle on which the legislation in question may be
declared null and void.

This is very delicate ground.

It is asking us to prostrate the plainly declared will of a co-ordinate depart-
ment of the government, not because it contravenes any provision of the organic
law which we are to expound, and all are to obey, but because it contradicts our
notions of justice.

Perhaps we have such a power; like the right of revolution, it is sometimes
obscurely hinted at in judicial opinions. Thus, in the case of *Fletcher* v. *Peck*,
cited by the opponents, the Supreme Court of the United States remarked: "It
may well be doubted whether the nature of society and of government does not
prescribe some limits to the legislative power; and if any be prescribed, where
are they to be found, if the property of an individual, fairly and honesty acquired,
may be seized without compensation."

So in the case of *Oakey* v. *The Mayor*, etc., 1·L. R., 11, our own predecessors,
through Porter, J., observed: "It is not necessary for us to say in this case
whether there are not, in the Constitution of every free country, certain funda-
mental principles, under which the citizen can find shelter and protection in ex-
treme cases. We will think of that when a case arises which requires us to
do so."

But, conceding that we have a right to protect the citizen against encroach-
ments from the legislative power, which are not specially, or by necessary impli-
cation, inhibited by the Constitution, it is obvious that a flagrant case of wrong
and hardship should be made out before this tribunal can be justified in thwart-
ing the legislative will, without a direct warrant for doing so to be found in the
Constitution itself.

I do not find the present to be such a case. On the contrary, there is a strong
equity in favor of the company and against the proprietors.

In the first place, the necessity of the work which has been done by the com-
pany is apparent. It was necessary to render the land of any utility to the pro-
prietors. In its primitive condition the vast morass in the rear of New Orleans
was unfit·for habitation or culture. A barren, possession to the owners, it was
supposed to be fruitful of mischief to the public by engendering the seeds of
pestilence and death.

It has been redeemed from sterility. A property has been, as it were, created
for the proprietors. It was a labor almost as great as that by which, in other
countries, human ingenuity has contrived to reclaim land from the dominion of
the sea.

In the next place, the work could never have been done by the proprietors,
singly. Combined action and a large capital were requisite. Without the inter-
vention of the legislative power the object could not have been achieved. The
proprietors, in common with other citizens, were represented in the Legislature.
They must be considered as having had notice of the Acts as they passed through
the various stages of legislation; not that such notice makes the Acts binding
on them, but it raises a presumption that, as they made no remonstrances, they
did not then regard the projected measure as oppressive to themselves. But
some of the opponents assert that the legislation was vicious, because it took all
authority in regard to the lands from the proprietors and gave it to a company.
In the able printed argument submitted on behalf of the opponents, it is said.

350 SUPREME COURT OF LOUISIANA,

DRAINING CO.
PRAYING, &C.

that "Massachusetts and Connecticut have provided by statute in regard to swamp lands, that a majority of two-thirds or three-fourths shall control the action of the remaining minority. To this," it is said, "there can be no objection; it is perfectly in harmony with a free government. The rights of private property will be perfectly secure under such a procedure. It is leaving private interests to be controlled by those concerned *as much as the necessity of the case permits.*"

But, looking at it in the light of principle, it seems to me that the legislation of those States is liable to all the objections, so far as the dissenting minority is concerned, that are urged with so much vigor against our own. If it is tyranny for the Legislature to do this thing, it is tyranny for a majority of proprietors to do it under the legislative sanction.

The charter of the company did not contemplate that the company should make a profit out of the work, or gain anything at the expense of the owners. Reimbursement for actual expenditures was the measure of the contribution. Even this was not to be exacted in case of failure to accomplish the beneficial result. The company took all that risk upon itself. Restrictions were imposed upon the company to guard against the perversion of its charter into an instrument of gain, and the regularly constituted judicial tribunals of the country were required to protect the proprietor from extortion, as well as to enforce the equitable right of the company to indemnity in case it succeeded in benefiting the proprietors.

A majority of proprietors could not have done all this. And it may safely be said that the private rights of the owners have been guarded by this legislation, as far as the necessity of the case permitted, if the work was to be done at all.

But there is still a further view of the equity of the company's claim. Not only did the proprietors, so far as we are informed, make no remonstrance to the Legislature with regard to what they now style the exorbitant power of the company, but although ample public notices were given of the intended proceedings of the company in pursuance of its charter, no injunction was sought from the courts to prevent this alleged interference with private rights, nor was any opposition filed to a decree being entered subjecting the lands to a mortgage pursuant to the 1st section of the Act of 1839. The servants of the company were allowed, without hindrance or opposition, to enter upon the lands, and commit what is now termed a trespass, running through a period of several years, nor until the reimbursement was called for does a complaint appear to have been uttered.

It is conceded that the work has been eminently beneficial to the proprietors, and that it has been carried on with their silent acquiescence, during many years, to this successful result.

Under these circumstances, a mere *negotiorum gestor* would be entitled to reimbursement from the proprietors. C. C. 2278.

Can the company be put *in duriori casu*, because it had a legislative warrant for its acts?

Undoubtedly, as the company claims under its charter, this principle of equity would yield to a higher consideration if the charter were in conflict with the Constitution of the State, under which the company acquired its vested rights, or with that of the United States. But as I do not find it to be so, nor, under the facts in evidence, to be in violation of common right, I cannot concur in declaring the Act of the Legislature in question to be null and void, and the company is in my judgment entitled to the rights therein conferred upon it.

But as a majority of the court have decreed otherwise, it would be idle for me to give my opinion upon the only questions which have been mooted between the company and the greater number of the opponents.

A rehearing having been applied for and granted, *Roselius* and *Janin*, for the Draining Company, submitted an elaborate argument, the substance of which was as follows :

I. According to the principles recognized by the majority of the court in the "*Benton street case*," the decision ought to have sustained the constitutionality of the charter of the Draining Company.

In the *Benton street case*, Mr. Justice Ogden, who was the organ of the majority of the court, says :

"Applying the test of our Constitution to the principles of law, thus recognized and established by the decisions of the courts of New York, where this subject has been fruitful of litigation, the question of the constitutionality of the assessment must be solved in the negative. Both the exercise of the right of eminent domain, and the power of taxation, are limited under our Constitution, and the rule with us is deduced not from general principles, but from the Constitution itself, that there does not exist either in the Legislature, or in any of the sub-divisions of State sovereignty, a power of apportioning taxation for public purposes, whether of a general or of a local character, except on the principle of equality and uniformity. There appears to be no other reason for the distinction which has been drawn between an assessment and taxation, when resorted to for the purpose of defraying the expenses of a public improvement, than the fact that the Legislature in 1832, thought proper to provide, that the costs and expenses of opening new streets in the city of New Orleans, which had been previously, under the act of incorporation of the city, paid out of the public funds in the city treasury, should be thereafter paid by what is called assessments for the benefits on the lots adjacent to the newly opened street. This act had only the effect of shifting the burthen of the expense from the people at large, who paid city taxes, to individual proprietors of lots in the neighborhood; it was not the less a tax, because the burthen was imposed on a few property holders in the shape of what was called an assessment. *There existed then no constitutional restriction of the power of taxation, or the exercise of eminent domain, and the validity of the Act of the Legislature, however unjust and liable to abuse, could not have been successfully impeached.* Under our present Constitution it is different, unless we should decide that the article referred to, was not intended to apply to city or parish taxes."

From the language here used by the learned Judge, it is evident that the decision of the majority of the court in the Benton street case, was placed wholly upon the ground that the Constitution of 1845 and 1852, had restricted the taxing power of the Legislature as well as of municipal corporations, by introducing the rule of equality and uniformity. If this be so, it seems, to our humble apprehension, obvious, that the learned Judge who delivered the opinion of the majority in the case of the Draining Company, was mistaken in saying, "tested by the doctrine of the majority of this court in the Benton street case, (9th A. R.) it (the constitutional objection) must prevail," for the rights of the Draining Company had been acquired and been completely vested on the 18th October, 1845, by the judgment of the Parish Court, decreeing, "that each portion of the property, situated within the section, shall be subject to a first mortgage and privilege in favor of the Draining Company, for the sum of eighty thousand dollars, which judgment was duly recorded in the mortgage office. The Constitution of 1845, was not adopted and did not go into operation until January, 1846. This judgment was rendered in contemplation of law, contradictorily with all the owners of property within the limits of the section, for the previous publications in the newspapers, according to the charter, stand in lieu of citations, as in the proceedings for the collection of taxes, or the monition in admiralty. It surely cannot be seriously contended that the subsequent adoption of the Constitution of 1845, could affect the validity of the judgment thus rendered. Hence, it appears to us, perfectly clear, that tested by the doctrine of the majority of this honorable court in the Benton street case, the constitutional objection cannot prevail. As, therefore, the foundation of the decision fails, the superstructure raised upon it must fall.

DRAINING CO.
PRAYING, &C.

II. The assessment for a local improvement, the direct and immediate benefit of which, to the persons assessed, is appreciable in dollars and cents, is not the imposition of a tax in the constitutional acceptation of that word, although the public at large may be evidently benefited by such improvement. *The State* v. *The New Orleans Navigation Company*, 11 M. R. 324. *Worsly et al.* v. *The Second Municipality of New Orleans*, 9 R. R. 333. *Lafayette* v. *Orphan Asylum*, 4 An 2. *Cawley* v. *Copley*, 2 An. 329. *In the matter of the Mayor, &c., of New York, praying for the enlargement, &c., of Nassau street,* 11 Johnson's R. 79. *In the cases of Owners of Ground, &c.* v. *Mayor, &c., of Albany*, 15 Wendell's R. 376.

The only case decided out of the State, in opposition to the uniform and well settled jurisprudence on this point, is that of *The People, en rel. Post and others* v. *The Mayor, &c., of Brooklyn;* but this decision cannot be invoked as authority, for it was reversed by the Court of Appeals, whose judgment is in conformity to correct principles. See the same case, 4 Comstock's R. 419. And the solitary opinion pronounced in this State, is that of a bare majority of the court, in the *Benton street case.* And it is to be observed, that that case has been overruled in the case of the *Municipality No. 2* v. *John Dunn*, 10 An.

III. The incorporation of the Draining Company for the purpose of draining the swamp and marshy lands, within the corporate limits of the city of New Orleans, is the exercise of the police power, and not that of taxation or of eminent domain.

*Bryon*, for opponents:

I maintained in my first argument these propositions:

That government can take of the property of the citizen, only under the right of eminent domain and the right to tax, except it may be for crimes and misdemeanors, and in the way of penalties and confiscations.

That the right of eminent domain and the right to tax, rest on the same basis, and are co-extensive, and their exercise is depending on the one and the same plea—of public necessity.

So that when government under the right of eminent domain, takes the property of the citizen, and makes compensation therefor, because of the unequal public burthen that would otherwise be imposed upon him; so too when government, under the right of taxation, takes the property of the citizen, it must take in like manner of the property of all of the citizens—otherwise it will be taking the property of one or certain citizens, for the benefit not of themselves only, but of all, which is alike unjust and unequal, and is virtually a taking of private property without due compensation being made; and amounts to expropriation and spoliation.

That under the right of eminent domain and the right to tax, government can take the property of the citizen only for a public use and purpose. That government cannot of itself, or by its agents, undertake the improvement of the property of the citizen, for his, the citizen's benefit, at the public expense, nor can it improve the citizen's property, out of regard to the public good, and at his, the citizen's expense. But that government when it acts, must act for the public and at the public expense.

I went a step further, and maintained that the power of government, over the property of the citizen, is no greater than it is over his person. That if the public necessity demands it—that government may exhaust the property of the citizen by way of taxation; so too under a like imperious necessity, it may call out its citizens by hundreds and by thousands, and send them to subdue an insurrection, or repel an enemy from their shores. But as when the necessity has passed, the citizen returns to private life and becomes again his own master, government cannot say to him that he shall follow this or that occupation, because the government thinks that it will be either for his own, or the public good. So too government cannot say to him, that he shall invest the wages of his labor in either one thing or another, on the plea that it will be for his own good, and for the public good, either, only in the way of taxation and in the manner already expressed. For as he who must labor at the will of another is a slave—so no less so, is he who must dispose of the wages of his labor at the will of another.

The application of these principles to this cause, is plain and simple: as will appear on the reading of the charter of the Draining Company. It will

be found, that the Legislature of Louisiana created this company. That it contracted with it, thereby making it its agent, to drain some two thousand acres of land, cut down the woods, &c., belonging to these defendants, and situated within what the company designate as the second draining section. That the Legislature made this contract without being moved thereto by the owners of the lands, or without counseling, or consulting with them, in any manner whatsoever. That the Legislature assumed the position of owner, and gave the right of draining these lands, and cutting down the woods, to the company alone—and to the exclusion of the owners of the lands—as will be seen even by reference to section 15 of the amended charter, which alone favors a contrary idea. That it stipulated with the company the price they should be paid for their labors; it agreed that the company might employ negroes on the work at certain and fixed wages, and charge on the amount, at the end of every month, ten per centum interest, as well as on all sums, from the time of their disbursement.

Thus far, the contract seems even between the two contracting parties. But when the company ask who is to pay them for their labors, the reply is strange, taken in connection with what had already taken place between them.

The answer is that these defendants shall pay them. The company might well have answered that the defendants were not parties to the contract. But either this not occurring to them, or more probably relying on the omnipotence of the Legislature, the company consents to the arrangement, provided that they shall have a mortgage paramount to all other liens whatsoever, on the lands in question, for such sum as it may deem necessary, to comple the works, and in anticipation of any work done, or money expended.

True, the Legislature does not say that the company shall have recourse to the property of the defendants lying without the draing section, but it gives it the right to take every foot of land they may own, lying within it. At the same time the Legislature declares, that it has this work done for the public good—for the good of the city, and the State.

The power exercised by the Legislature,in this matter, over the property of the defendants, is boundless and omnipotent. It virtually divests the owners of their property, and gives it into the hands of this company.

We said to this honorable court, that the Legislature had transcended their authority in the premises, and it sustained our position, on the ground that the work was done for the public good, and therefore the public should pay for it.

But the plaintiff is dissatisfied with the judgment, and has asked for a re-hearing, which this honorable court has seen fit to grant.

And the distinguished counsel for the plaintiff say :

First. That according to the principles recognized by the majority of this honorable court in the Benton street case, the decision ought to have sustained the constitutionality of the charter of the Draining Company.

And what was the principle decided in the Benton street case? It was, that taxation should be equal. One would have supposed that the establishment of such a rule for the government of States and cities, would have given universal satisfaction. It would be hailed with exclamations of delight, by many people in many lands—a few alone would complain, and that because, that hereafter, they would have to bear their share of the public burthens. Inequality of taxation has been the great instrument of tyranny, and oppression in all times, and under all governments; for where taxation is equal, it is not likely to be excessive, for all have an interest in keeping it within the bounds of moderation. But where the rich and powerful and ruling classes are exempted, as is the case in most countries, then their interests become distinct, and the tax payers groan under burthens imposed by those whose interest is in having them increased, rather than diminished.

But such is not the condition of these free States. Our country began its career among the nations under happy auspices—with States equal in rank and honor—with citizens, equal in rights, privileges and exemptions—so that equal right, equal privileges, and equal exemptions, may be said to be the birthright of an American citizen.

These things then belong to the citizen, and will still belong to him, until it shall appear that he has voluntarily parted with them, and this cannot be taken for granted from mere silence, but it must appear to have been done, on due deliberation, and in an open and public manner.

If these things be so, what mattered it, that the Constitution of 1812, did not, in so many words, prohibit unequal taxation. Such a prohibition was not necessary, because, unequal taxation is antagonistic to the foundation principles of our government.

For if there be any foundation principle to the government of the United States, and the governments of the several States, it is the principle of equality. That is the corner stone of the grand edifice of American freedom. If that shall be removed, the whole structure would be broken up, to assume new forms, and new principles.

To say, therefore, that a State had formed a government on the principle of equality, and had at the same time incorporated into it the right to tax a certain kind of property in the hands of one citizen for the benefit of the State, the exemption of the same kind of property in the hands of others, or one portion of a city, or of the State, to the exemption of other portions, is an absurdity, and a contradiction on the face of it.

For what do men form governments, unless it be to secure their lives and fortunes. And yet, if they form a government with power to take one man's property for the public use to the exemption of other men's property of a like kind, thereby imposing the whole burthen upon him, and making him in reality a slave—then in truth they have formed a government to take property, rather than to secure it; and are worse off than before they bound themselves in a government compact, because, before they were free, and had the right to defend themselves, and property as best they could.

Should the general government impose direct taxes on the States? Should she impose one per cent. on Massachusetts, and two per cent. on Georgia, would Georgia submit to it? Would she not say to the government, I am the peer of Massachusetts, and not her bondsman; what she pays, I will pay, and no more.

As the States stand to each other, so stand the different portions of the same State to each other, and so stand the citizens; the one is the peer of the other. And there is no power in the general government, and no power in the State governments to make it otherwise, and it cannot be changed but by revolution.

But it may be said, that there is a compact expressed between the States—true there is, but it was made to fix the basis of representation, and because there were certain persons and property abounding in some of the States, more than in others, and the representation being fixed, taxation must follow it, according to the theory of our government.

Again, according to the principles of our government, the States retain such powers as are not granted expressly to the general government, and in like manner, the citizen retains such rights and powers as are not granted to the State governments.

Therefore, it is that in order to exercise the power of unequal taxation, a special grant of such power should have been made in the Constitution.

Is it to be supposed that the powers of the Constitution of 1812, and the citizens who voted to accept it, believed for one moment, that they had adopted a government possessed with absolute and despotic powers over their property. Yet, such was the case, if the construction contended for on the part of the plaintiff be correct.

There appears no restriction of the power of taxation, or the exercise of the right of eminent domain in the Constitution of 1812. The Legislature then could impose at will, all the public burthens on the city, or on the country—it could make one parish pay the debts of another—it could make one portion of a parish bear the taxations of the whole—it could go farther and say, that one class of citizens should bear the whole burthen of taxation.

And under the exercise of the right of eminent domain, the Legislature could take the lands of the citizen for roads, streets, or any other public purpose, without making compensation therefor. It could go still further. It could expropriate the property of A, and give it to B, or declare it vested in the State.

Yet, this same Constitution prohibits the Legislature from passing any *ex-post facto law*, or law impairing the obligation of contracts, or prohibiting emigration from the State. Yet, the things prohibited, and thereby protected, important as they are, are of small moment in comparison with equality of

taxation, and the right of compensation when property is taken under the right of eminent domain.

The framers of the Constitution, therefore, must have considered that there was this difference between them, that the former being opposed to the very character of a free government, and indeed to the very purposes for which all governments are formed, was beyond the power of the Legislature, and therefore, there was no necessity of providing against it—while the other, not reaching to the essence and frame work of government, was a matter within the scope of legislative power, deemed it proper to throw around the citizen, the protection of the Constitution, lest in times of great internal commotion, the Legislature might be tempted to pass some *expost facto law*, or in some great break up in monetary matters, it might be led to pass some law impairing the obligation of contracts; and again, in times of war or insurrection, it might prohibit citizens from emigrating from the State, as might be the case, in order to escape the consequent duties and burthens.

It will not avail to say that these suppositions are extravagant, and could never become realities under our representative government. In regard to taxation, there is a show of probability in the suggestion, for the whole community is interested to resist, and the ballot box gives it the power. Yet, some noted instances have occurred of gross inequality of taxation under legislative acts; but when you turn to the exercise of the right of eminent domain, there is no such protection, the individual citizen stands alone on one side, with the whole power of the government on the other.

I say, therefore, it is not credible, that the framers of the Constitution of 1812, or the people of the State who adopted it, believed that they were leaving the rights, which are so dear to every freeman, to the ignorance or caprice, passion or corruption of their Legislatures.

But let us change the picture a little—let us suppose that in harmony with the construction of the Constitution of 1812, claimed on the part of the plaintiff, that articles had been submitted to the convention, empowering the Legislature to tax unequally the individual citizens, and the different portions of the State, and to take the property of the citizen under the right of eminent domain, without due compensation being made. Think you, if there had been a member of that convention, either bold or simple enough to offer such articles to be engrafted into the Constitution, that he could have found another, bold and simple enough to second them. No, sirs, there was no such man in that convention, nor in any other, composed of men equal to each other, and representing citizens equal in like manner. There is no man living in the State today, of any weight of character whatever, who would dare make such a proposition. And yet, they would have us believe, that the convention, by its silence in regard to these matters, and the people of the State at large, intended to give such powers to the Legislature.

The dangers to society at large, and to personal and private rights in the times we live in, are not in open violence and outrage, as in days gone by, when the weaker submitted to, and served the stronger, but in sly, secret and insidious encroachments, and under the plea of the public good, and good to the individual. This is the wolf in sheep's clothing, which is the plague of civilized and christian countries in our times.

It is under this plea, that cunning and designing men, avaricious of gain, and ambitious of power and notoriety, accomplished their purposes, oftentimes at the public expense, but more commonly, at the expense of a small minority of the public, but under the public sanction and authority.

They cry out upon the streets and highways, that such a work or enterprize will be of great public utility and benefit—that it will benefit every body, and therefore, every body must go for it. That it will cost the public nothing, as a certain small portion of the city, parish or State, will be more especially benefited, and therefore, that portion must pay the cost of it. So, too, fanaticism under the plea of philanthrophy and the public good, is ready to purge and renovate society—revolutionize governments, and reconstruct the world according to its new ideas, provided that the cost and the consequent pain and sufferings, shall be borne by its beneficiaries.

Let us test the working of the Constitution of 1812, under the construction contended for on the part of the plaintiff, for the question now under discussion is, what were the powers of the government under that Constitution?

Suppose the government wanted a square of ground in New Orleans, for a

State House, hospital, or for some other public purpose. It selects the square, and finds it owned by a number of individuals. It says to the owners, I will take the square, and give you so much a lot for it. The owners say no. We do not want to part with our property, and if we did, what you offer for it, is not the half of its value. The government answers, I will take the square, and what I have offered is all that I will give for it. Could the government go and take this property ; or, when the agents or employees of the government begun to pull down the houses of the proprietors, they should appeal to this court for protection, and to have them enjoined, would the court grant their prayer ? Or would it say to them, that hard as was their case, that it had no power to act—that the government was absolute and supreme in such matters—that they had better take what government offered them—for government had the power to take what property it pleased belonging to the citizen, and pay him what it pleased, or even nothing at all?

In most countries in christendom, probably the courts would interfere in a like case. This thing, probably, could not have taken place in England, since the days of King Alfred, unless in times of civil war and revolution. The boasted omnipotence of Parliament, never reached that far, and if it had, Lord Coke says, the courts would have restrained it.

The nearest approach to it recollected in its history, was the confiscation of the estates of the church in the times of Henry the 8th, and that was a revolution in religion—a throwing off of allegiance to a foreign potentate—besides, the property possessed a public character.

Great injustice was frequently perpetrated under writs of attainder—with loss of life and estate, but the injustice consisted in the falsehood of the charge and the wicked means by which it was substantiated.

But let us take a case which has happened, in the place of one supposed.

The Legislature in 1832 passed an Act in regard to the opening and widening of streets, and the laying out of public squares. It provided that commissioners should be appointed, who should take into consideration the lots and squares lying adjacent to the contemplated street or square, and should estimate the damages that will follow from the improvement, over and above the benefits, to any of the property, and all of the costs, including commissioners' fees, court costs and damages, and paying for the land taken, etc., they shall place upon the balance of the property lying along and adjacent to the street, as equally as can be done according to the benefits.

The commissioners are not permitted to estimate the benefit to each lot, and assess that lot that much, which would look more like justice—the public at large paying the balance—but this property must bear the whole burthen, although in the estimation of the commissioners, and in truth, the property is not benefited, if at all, not one-tenth of the amount imposed upon it. But the Act goes on and provides that in case the proprietor within a certain time does not pay the amount assessed upon his property, to the city government, that execution shall issue, and it shall be sold for what it will bring, and although it may not bring the amount assessed upon it—(which has happened in two instances which have come to my knowledge)—this is called a local assessment for the benefit of property.

Take the example of opening a public square, under the law of 1832. I will suppose that some citizen owning several squares in a part of the city not yet built up ;* that he had designed one central square to be kept forever open for the benefit of the adjacent squares, and as he sold lots fronting on this square, he granted to the purchasers and their assigns the right to use this square in common, for pleasure and recreation, with the proprietors of the lots fronting on the square, at the same time making some equitable arrangement for keeping it in good order and condition. After a time, the City Council determines to take this square for the public use. The law requires that the value of this square shall be assessed on the adjacent lots, and it is to these lots that it already belongs, in equal and just proportions, so that the commissioners, in accordance with the fact, can only report to the court that the matter is finished to their hands—that there are no damages to be assessed, for that they rest already on the property required by law—and in like manner the benefits belong to the property designated by the law, and that the square is well fenced and in good condition. The only thing for them to do is to assess, on the adja-

---

*I presented a similar example in my original brief, but not in the same connection, and erred then from inattention in confounding together the laws in regard to opening and paving of streets

cent lots, their fees, etc., and the court costs, and the only thing for the court to do, is to decree that this square, which belongs to the owners of the adjacent lots, and for which they have not received one cent, is no longer their property, but the property of the corporation of New Orleans, and that they shall pay the costs.

Such is the working of the law of 1832, under the Constitution of 1812, as it has been hitherto interpreted, and if the taking of property in the opening of a street be called taxation, which it really is, or an assessment for a local benefit, in either case, the operation of the law is unequal and unjust, tyrannical and oppressive, and no man deserves to be free, who, after understanding well its workings, will submit patiently to it.

And in the case supposed of opening a public square—a case by no means insupposable, as such squares are common in many cities—the taking of the property, is a taking under the right of eminent domain, and without any compensation being made.

Here, then, is the government of Louisiana, judging of the necessity of taking the property of the citizen, and at the same time judging of the compensation to be made for it—which two things cannot be united in any government, no matter what its form or name, without making it despotic.

Despotic governments in former times, when they wanted to commit an act of tyranny and aggression on the property of a citizen, would have them charged with some great public crime, such as treason or blasphemy. Your Honors will recollect well in Bible history, the history of Ahab and his wife, Jezebel, and Naboth and his vineyard. How that Ahab wanted Naboth's vineyard for a garden to raise herbs in, " and Ahab spake unto Naboth, saying give me thy vineyard, that I may have it for a garden of herbs, because it is near unto my house: and I will give thee for it a better vineyard than it, or if it seem good to thee, I will give thee the worth of it in money."

" And Naboth said to Ahab, the Lord forbid it me, that I shall give the inheritance of my fathers unto thee."

At this Ahab was heavy and displeased, at which Jezebel inquiring the cause, comforts him, by promising him the vineyard of Naboth ; and her manner of bringing this to pass, was to have Naboth charged with blasphemy against God and the King. She wrote letters in the King's name, and had a fast proclaimed, and she suborned two men, sons of Billial, to testify against him, in the assembly of the people. " And they witnessed against him, even against Naboth, in the presence of the people ; saying Naboth did blaspheme God and the King. Then they carried him forth out of the city, and stoned him with stones that he died."—See Bible, 1st book of Kings, chap. 21.

We may comfort ourselves that we are better off than our forefathers, in that a way has been devised, whereby governments can take the property of the citizen, without first taking his life ; in that at least we show some progress in the science of government, and the State of Louisiana, it may be, is entitled to as much credit in this matter, as any other.

Had Ahab and Jezebel understood this business as well as we do, had they had our Constitution of 1812, our Legislature, Common Council, Commissioners, etc., Ahab could have easily gotten the vineyard of Naboth, without taking his life, and with a less responsibility, and thereby have saved himself and Jezebel from that terrible curse, which was uttered against them, and their posterity, and shortly after executed.

There is one other consideration which I will bring to the notice of the court, under this branch of the subject.

It is that according to the theory, history and principles of our government, taxation and representation go together. The history of this principle is undoubtedly familiar to your Honors.

" The maxim that there can be no just taxation without representation, was asserted in Magna Charter. Afterwards, more fully and comprehensively in the statute called confirmatio chartararum, in the twenty-fifth year of Edward II, which abolishes " all aids, tasks and prices, unless by common consent of the realm, and for the common profit thereof," and having been at times the subject of contention between the crown and the people, it was finally, in that revolution, which cost Charles his life, and established the liberties of England, again declared in the Petition of Right, which has ever since been regarded as part of the organic law, " that no man hereafter be compelled to make or yield any gift, loan, benevolence, tax, or such like, without common consent by act of Parliament."

We know that taxation has been the most efficient instrument of tyranny, at all times, and under all forms of government. The history of the resistance of the people to its unjust exercise, would be a history of the progress of liberty. Our national history commenced with such resistance. It was not the amount involved in the *tea tax* and *stamp act* which aroused our forefathers to resistance to the mother country—but it was the principle that taxation and representation should go together—a principle made dear to Britons, by centuries of resistance against its infringement, and finally forever established on a firm basis, through revolution and blood.

Now, it is evident that taxation and representation cannot be said to go together in any just and proper sense—only in cases, where those who impose the tax, bear each their portion of it. So, that when a State government imposes a tax, as every portion of the State is represented in the government, so the tax must be imposed on every portion of the State—and so too of a parish or city government.

The State cannot impose a tax on a small portion of the State for the benefit of all of it. For although it may be said that that portion is represented in the government, yet, it is in a minority, and the other portions of the State would occupy the position of a stranger and master, in imposing taxes on it, of which they pay nothing. Their interest being to make the taxed portion pay as much as possible, as what it pays accrues to the benefit of the whole State. For the same reason, the whole State cannot tax a portion of the State for its own benefit.

To illustrate this matter, the case before the court is a case in point.

For the government of the State have imposed on something like two thousand acres of land, the taxation necessary to pay for an improvement, which the government declares to be of public benefit to the city of New Orleans and the State at large. While there is no limit to the amount of the tax to the benefit received, or of what part of the land may be taken; so that the entire property may be taken. While this land is but a small fraction of the lands of the State, and the proprietors but a small fraction of the people of the State, and their representation in the government, but as a drop in the Ocean.

But the learned Judge who delivered the opinion of the court in the Benton street case, in the course of his remarks, uses the following language :

" There existed then no constitutional restrictions of the power of taxation, or the exercise of eminent domain, and the validity of the Act of the Legislature, however unjust and liable to abuse, could not have been successfully impeached."

This language, it will be observed on reading of the opinion, was not necessary to the support of the principle decided ; for the question was as to the constitutionality of the Acts of 1832 and 1847, in regard to the opening of streets, under the Constitutions of 1845 and 1852, and not under that of 1812. And the Constitution of 1845 and 1852, expressly requiring taxation to be equal, the only question, really to be decided, was whether an assessment on the property of the citizen for the expense of opening of a street, was a tax or not. The court declared it to be a tax, on the ground that the streets are opened for the public use and benefit. And if the public should pay for it, it would do so in the way of taxation, and the shifting of the whole burthen on a few citizens, or on the property of a few citizens, will not change its character—if it would be a tax if the public paid it, it will be a tax still if a small portion of the public pay it.

So, that the assessment being declared a tax, there was an end of argument, for the new Constitution settled the manner in which it should be paid beyond cavil. Therefore, the powers of government under the Constitution of 1812, not being under discussion, nor within the proper scope of the argument, the language of the learned Judge referred to, cannot be said to be a judicial interpretation of such powers.

I close this branch of the argument, by reading from 3 Dallas, 308.

" I cannot subscribe to the omnipotence of a State Legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the Constitution or fundamental law of the State. The people of the United States erected their Constitution or forms of government—to establish justice—to promote the general welfare—to secure the blessings of liberty, and to protect their persons and property from violence. The purposes for which men enter into society will determine the nature and tenor of the

social compact; and as they are the foundation of the legislative power, they will decide what are the proper objects of it. The nature and ends of legislative power, will limit the exercise of it. This fundamental principle flows from the very nature of our free republican government, that no one should be compelled to do what the laws do not require; nor refrain from acts which the laws permit. There are acts which the Federal or State Legislature cannot do with out exceeding their authority. There are certain vital principles in our free republican government, which will determine and overrule an apparent and flagrant abuse of legislative power; or to authorize manifest injustice, by positive laws, or take away that security for personal liberty or private property, for the protection whereof the government was established. An Act of the Legislature, (for I cannot call it a law,) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. The obligation of governments established on express compact, or on republican principles, must be determined by the nature of the power on which it is founded. A few instances will suffice to explain what I mean. A law that punished a citizen for an innocent action, or in other words, for an act, when done, was in violation of no existing law. A law that destroys or impairs the lawful private contract of the citizen. A law that makes a man judge in his own case, or a law that takes the property of A, and gives it to B. It is against all reason and justice, for a people to entrust a Legislature with such powers, and therefore it cannot be presumed that they have done it.

The genius, the nature and the spirit of our State governments, amount to a prohibition of such acts of Legislation, and the general principles of law and reason forbid them. The Legislature may enjoin, permit, forbid and punish; they may declare new crimes, and establish rules of conduct for its citizens in future cases—they may command what is right, and prohibit what is wrong, but they cannot change innocence into guilt, or punish innocence as a crime, or violate the right of an antecedent lawful private contract, or the right of private property.

To maintain that our Federal or State Legislatures possess such powers if they had not been expressly restrained, would, in my opinion, be a political heresy, altogether inadmissible in our free republican governments."

I read again from 4 Hill, 144:

"Under our form of government, the Legislature is not supreme. It is only one of the organs of that absolute sovereignty, which resides in the whole body of the people. Like other departments of the government, it can only exercise such powers as have been delegated to it; and when it steps beyond that boundary, its acts, like those of the most humble magistrate in the State, who transcends his jurisdiction, are utterly void."

Mr. Justice Story, says: (quoted from 2 Peters, 657.) "The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least, no Court of Justice in this country, would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles and civil liberty—lurked under any general grant of Legislative authority, or ought to be implied from any general expression of the will of the people."

"The security of life, liberty and property, lies at the foundation of the social compact; and to say that this grant of Legislative power includes the right to attack private property, is equivalent to saying that the people have delegated to their servants, the power of defeating one of the greatest ends for which the government was established. If there was not one word of qualification in the whole instrument, I should feel great difficulty in bringing myself to the conclusion, that the clause under consideration, had clothed the Legislature with despotic power."

Thus, far removed from local strifes and passions, the great national tribunal has discoursed upon the powers of our governments, the rights of the citizens, and the rights of property: and after this manner has it continued to discourse, upon that and kindred subjects, as far as my reading extends, from the beginning to the present.

Therefore it is that I come to the conclusion that according to the true theory of our government—that the Legislature is not absolute and despotic— that in certain things it would have power were it not restrained by the Constitution, because they are within the natural scope of legislative powers—that in other things, it has no power, though the Constitution is silent respecting

them—and an express grant could alone give the power. And of this character is the taking of the property of the citizen; it cannot be taken for private purposes, but only under the public necessities and for public uses. And as the principle of equality lays at the foundation of our free republican governments—that citizens are alike entitled to equal rights, equal privileges, and equal exemptions. So government cannot lay the whole burthen of the State upon one citizen, or on a few citizens, to the exemption of others, or on one portion of the State, parish, or city. to the exemption of other portions. It cannot take the property of the citizen, under right of eminent domain, without first making compensation, because it would be unequal and unjust, and would virtually degrade such citizen to the character of a bondsman—working for the commonwealth at large. And for the same reason, it cannot take the property of one citizen in the way of taxation, to the exemption of other citizens, or of one portion of the State, parish, or city.

For the only or main difference in the taking of the property of the citizen for public use under the right of eminent domain, and the right to tax, (for the power is the same in both cases,) is, in the first case, the government judge of the necessity of the taking, but not of the value of the property taken—but as to price; governments submit that question to a Court and jury, or to sworn and disinterested commissioners, while in the other case the government is judge of the necessity of the taking and also of the consideration to be given: that is, it determines the subject, to which it is proper to appropriate the revenues raised by taxation.

But the Legislature of Louisiana, in authorizing the Draining Company to do certain works on the lands of defendants, situated in the second draining section, for the benefit of New Orleans and the State at large, and to pay for the expense of said works (whatever the same may be), to assess a tax on said lands, and collect the same, to the exemption of every other portion of the city or State—the said lands being but a fraction of the lands of the city and State—violated thereby the fundamental principles of our free republican governments—

And, therefore, the majority of this Honorable Court was right in declaring said authorization of the State Legislature of the said company in their charter, was unconstitutional, null and void.

But on the supposition that the position I have taken on this point is not tenable, but that under the Constitution of 1812, the power of the Legislature was omnipotent, over the property of the citizen—what is the position of the parties?

The counsel of the company contend that, "the rights of the Draining Company had been acquired and been completely vested on the 18th of October, 1845, by the judgment of the Parish Court decreeing "that each portion of the property situated within the section shall be subject to a first mortgage, in favor of the Draining Company, for the sum of eighty thousand dollars." "The Constitution of 1845 was not adopted and did not go into operation until January, 1846."

But the company now claims, instead of the $80,000, of which it says that it obtained a mortgage, $326,000, and more than two years interest on the same, at 10 per centum, making at least $400,000.

Surely a mortgage inscribed for $80,000 will not vest a right to $400,000 by any rules of calculation yet discovered—so that if the company has any rights vested under the Constitution of 1812, they cannot amount to more than their mortgage of $80,000, and what interest may have accrued on the same, according to the terms of the charter.

I examined this point at some length in my original brief, to which I beg leave to refer your Honors, page 37, and will only remark in addition to what I have said, upon the question of notice—

It was said "this judgment was rendered in contemplation of law, contradictorily with all the owners of property within the limits of the section, for the previous publications in the newspapers, according to the charter, stand in lieu of citations, as in the proceedings for the collection of taxes, or the monition in admiralty."

There is a marked difference between notices published in the newspapers, in regard to the collection of taxes and monitions in admiralty, and this case.

There is a difference between what we call in law private and public statutes —the Courts will take notice of a public statute, without reference being made

thereto in the pleadings—not so in regard to private statutes—but they must be specially plead by the party relying on them. Now, acts in relation to taxes are of a general nature, and so is the law, or rule in regard to monitions in admiralty. But this charter of the company is a statute of a private character, so far as these defendants are concerned, and they cannot be expected to take notice of it, or have notice of it, unless it is brought to them in the ordinary and legal mode. It will not do for the Legislature to make a special rule for this case—for that is liable to the same objection of being a private statute. Now, unless it shall appear that the defendants had notice, by some means, of which there is no proof, it cannot be said that "this judgment, in contemplation of law, was rendered contradictorily with all the owners of property within the section."

I come now to the second proposition of the learned and distinguished counsel. That "the advertisement for a local improvement, the direct and immediate benefit of which, to the persons assessed is appreciable in dollars and cents, is not the imposition of a tax, in the constitutional acceptance of that word, although the public at large may be incidentally benefited by such improvement."

I examined this matter at considerable length in my original brief, beginning at page 5, to which I solicit your Honor's attention, and though I might add something, perhaps, to what is there said, yet as nothing new has been urged against my positions, except a citing of authorities, I shall pass it with some few remarks on some of the cases cited.

But I will say that as the proposition is stated, it is not applicable to this case. There is no evidence in the record, to enable the Court to estimate, in dollars and cents, the benefit done to the lands of defendants in the second section by the work of the company, nor is the matter susceptible of proof, for every witness brought to say it was a certain sum, another could be brought to contradict him. It is very difficult to find men agree on the value of property situated as this is—for improved property is easily valued, and so is unimproved property situated in close proximity to improved. But when you come to estimate property, which in all human probability will not produce an interest on any investment that may be made upon it, for the next ten or twenty years, and the same all the time paying the heaviest taxation at the highest market valuation, of the most excited and inflated times—it will be very difficult to get men to agree, for while one man of large hope and sanguine temper will look upon the property as extremely valuable, another of an opposite temperament, will look upon it as worthless, and would not pay the annual taxes upon it, for t. So too, in estimating the causes of its increased value, for there is no doubt the lands are worth more than they were in 1845. But individuals will ascribe the rise in different proportions to the different causes which have had their influence in rising the value of this out-side kind of property. See *Mr. Beard's* testimony, Printed Evidence, page 14.

No better illustration of the uncertain value of this property can be made than the case cited by the counsel of plaintiff. The sale of the property by the *Madame Pontalba* took place in the spring of 1853: price $125,000. With the exception of two squares, the property, having passed from the original purchaser into other hands, was sold at public auction within the last five months for the sum of $63,565.

The claim of the Draining Company is now, probably, over $35,000. So, if, as the counsel says, the land was only worth $5,000 before drainage, the increase, measured by the above data, will not be very great for the period of over seven years, since which time the drainage has been completed.

The first two cases referred to by the counsel in support of this second proposition, are, the *State* v. *The New Orleans Navigation Company*, 11 M. R., and *Worsley et al* v. *Second Municipality of New Orleans*, 9 R. R. The purpose of the first suit was to avoid the charter of the Company. The Navigation Company was organized, among other projects, with a view of clearing out and rendering navigable the bayou St. John, and extending its navigation by means of a canal, and having done this, its charter authorized it to collect certain tolls for its use; but this, it was contended, was in contravention of the Act of Congress, which stipulated not only for the freedom of navigation, but also for an exemption from any impost, tax or duty therefor.

The other one involved the question of the right of the Municipality to

46

charge wharfage for the use of the wharves along the river, which wharves belonged to her. And the Court very properly decided, that tolls and wharfage are not taxes. In most cities wharves are private property, and the owners charge for their use; and it is difficult to see why such charge should be called a tax, any more than the money paid for the use of a house should be called a tax, rather than rent. And so of a canal, or stream, which has been made navigable—why should the sum paid for their use be called a tax, any more than that paid for the use of a railroad for freight or passage? It is true, we might call every payment, made for any purpose whatever, a tax; but our language is not so poor; therefore we call the money paid for the use and occupation of houses, rent; that paid for the use of money, interest; that for carrying us to and fro, whether by stage, railroad, or vessel, passage money; that for transporting our goods, freight; that for the use of canals and bridges, tolls; what we pay for labor, we call wages, and for professional services we call fees. And so on, we have a name for everything of the kind, which is more exactly appropriate than any other. But when the government asks money of the citizen, in any manner whatever, except for the use of government property, such as buildings, roads, bridges, canals, &c.,—in which matters the government is in relation to the community like any of its citizens,—we call it taxation. This is the generic term of all money received from the citizen, except for crime and in the way of penalties. There are the different modes in which these taxes are imposed and gathered, and these modes receive their specific names, such as duties, imposts, &c., but taxation is the great term, which embraces and comprehends all. These views I maintained in my original brief, beginning at page 7.

But I can see but little parallelism between these cases and the proposition of counsel. In the one case, a company make a canal, and deepen and clear out a bayou, and it charges a toll on those who find it convenient to use them, and if the same company had invested their money in any other enterprize—the running of steamboats, or manufacture of cotton, they would have received something from those who traveled on their boats, or who purchased their goods. In the other, the city government makes wharves on her own property, and charges something for their use. She may make the wharves or not as she sees fit. But it is a very differant thing when government goes upon the lands of certain citizens, and for the public use opens a street, and makes them pay the whole cost of it. To make the cases at all parallel, it should make all who use the street pay something, and those only pay wharfage, or tolls, who use the wharves, or navigate the canal and bayou.

So too, in regard to the case before the Court. The government by its agent, goes upon the lands of defendants, and does certain things which it declares to be done for the public good; but it charges the whole cost on the defendants, who are a few individuals. Whereas, in order to be consistent with the cases cited, it should be on the public at large, because all are benefited. It comes to this then, that the city and company improved their own property for the direct purpose of getting an income from it, and incidently to benefit the public; and the government made an improvement on the lands of certain citizens, not for their own good, which it could not do, but for the public good; but tax the whole cost on these few citizens. In the first case, those only pay who are benefited—while in the latter, only a small fraction of those who are benefited, are made to pay at all.

But the case of the *People* v. *Mayor of Brooklyn*, 4 Comstock, 419, and cited by counsel, is altogether at variance with this second proposition.

The Court says, "that private property may be taken for public use in two modes—that is to say, by taxation, and right of eminent domain."

"The validity of the assessment in question, therefore, cannot be maintained as an exercise of the power of eminent domain, and it cannot be maintained at all, unless it be a legitimate mode of taxation. See page 425. It goes on and controverts the opinion of Chief Justice Savage, quoted by counsel, in 15 Wendell, R., and all other cases of like import, decided in New York, and fully sustains the opinion of the majority of this honorable Court in the Benton street case, in regard to the question, whether an assessment made on adjacent property to pay the expense of a street, be a tax or not.

Thus, has this question been put at a rest, we may hope, at least, in Louisiana.

It has been settled at last, by simple recurrence to first principles—by

inquiring what were the powers of government over the private property of the citizen—for what purpose it might be taken, and in what modes.

It is true, that the Court, after declaring the assessment to be taxation, also declared it to be a legitimate mode of taxation under the Constitution of New York, which, as interpreted by the Court, gives unlimited power to the Legislature, over the citizen's property, in the mode of taxation.

It is evident, that the manner in which these cases were decided, never gave public satisfaction, else, suits involving the same principle would not have been so constantly before the Courts. There is no man, probably, who ever had this method of taxation applied to himself, who did not feel that there was great injustice in it, although he could not, perhaps, explain it.[*] And the Courts themselves, if we could judge by the language and tone of their decision, where not much better satisfied. They · seem to have felt, that their judgments rested on an uncertain foundation, for they assert no fixed and distinct principles—they see and feel its injustice and inequality, and they apologize for it—some in one way, and some in another. One says "that the system of paying for local improvements out of the general treasury, is inequitable, will result in great extravagance, abuse and injustice. (See dissenting opinion in Benton street case.) And if it will be inequitable to pay for an improvement, made at the will and demand of the public, out of the public treasury, will it be more equitable to put the whole burthen on one or a few citizens. If injustice and oppression are to result from an act of the government, I say let not their weight be felt by every citizen, and then it may be that such act will not be rep. ated. The converse of the propositions stated by the learned Judge, should be true, else our governments are bad in practice, if not in theory; for where all bear equally the public burthens, all are interested in restraining extravagance, and correcting abuse and injustice. It is because the public pay nothing for these local improvements, which they, the public, have made, for their own convenience—that they are always so ready to have them undertaken. The great public stands aloof with folded arms, and say to a few individual citizens, you shall do this, or do that, and they are powerless to resist. For it is the weakness and misfortune of our governments, that the individual is powerless, when his rights and the public interests, or prejudice, are opposed.

For what can he do, standing alone before the great Lord and master—the public—eager for his life, or his property? His only hope is in the judiciary— and if it fall into the popular current, although unconsciously, it may be, like as a ship at sea, falls in with those silent and unseen currents in the ocean, which bear the unconscious mariner far away from his latitude and longitude— his case is hopeless, he will be sacrificed to the insatiate multitude.

But if individuals are powerless, men associated in bonds of interest are mighty, they can control the legislative department of government at their will. In a great sister State, the railroad corporations have but to unite, and they can give such character to the Legislature as they choose.

As an evidence of it, most of their charters contained when granted, some limitations and restrictions in favor of the public, or State, these have, one by one, been removed, under the potent power of united interest and action. In truth it must be acknowledged, sad and humiliating as the acknowledgment is, that the great operators of that State make a convenience of their Legislature, in the accomplishing of their purposes; and while this is the case, it will be found difficult to impose constitutional restrictions upon legislative power, in the taking of the private property of the citizen.

Thus it is, that it is so dangerous to the rights of property, this practice— for principle it is not, for all true principle is against it—of taxing upon one citizen, or a few, the entire cost, of any work done at the will and demand of the government, or public at large.

The third and last proposition of the distinguished counsel is, that " the

[*] Were I called upon to explain the reason of the passage and toleration of such Acts, as the charter of this company, and the Acts of 1832, in regard to the opening of streets, I should say, it was because few ever feel practically, the injustice and inequality of their operation—for few new streets, comparatively, are ever opened in a city, and few sections of land drained. And human nature is such, that men are willing to see others suffer injustice, or will, at least, remain passive if so be, that they are to be benefited thereby individually, or as a part of the public. Moreover, under our form of government, the people are not so jealous of their government, as under more strong and absolute governments; in such governments, when an act of aggression is committed on a citizen, all are alarmed, and they stand together as against a common enemy.

incorporation of the Draining Company, for the purpose of draining the swamp and marshy lands, within the corporate limits of the city of New Orleans, is the exercise of the police power, and not that of taxation, or of eminent domain.

Sir William Blackstone in his Commentaries on the common law of England, divides wrongs into private and public; and it is from this source that we get our police and criminal jurisprudence. And if the lands of defendants, situated in the second section, were a wrong to private citizens, or the public at large, they must fall under some head, of one or both, of these divisions, and I can find none to which they with any propriety can be said to belong, except it may be nuisance—so I shall examine the matter under that head. Under the head of private wrong, chapter 13, book 3, the great commentator first opens upon this subject. He defines a private nuisance to be, " any thing done to the hurt or annoyance of the lands, tenements, or hereditaments of another." He then divides nuisances into such as may affect a man's corporeal hereditaments, and then those that may damage such as are incorporeal. The examples he puts are undoubtedly familiar to your Honors—they are, in short, if a man builds his house so near mine as to throw the water from his roof on to mine—if he erect a building so as to obstruct my ancient lights, and so if he keep his hogs so near my house, that the stench incomodes me, and renders the air unwholesome, and so of trades which are offensive. But depriving one of a mere matter of pleasure, as of a fine prospect by building a wall, or the like, this is no injury, and is therefore not an actionable nuisance. So, also, if my neighbor ought to scour a ditch, and does not, whereby my land is overflowed, this is actionable; so is the stopping of water that used to run to another's meadow or mill, or to corrupt or poison the water course by erecting a dye house or lime pit, upon it.

As to incorporeal hereditaments, if I have a way annexed to my estate across another's land, and he obstructs me in the use of it, either by totally stopping it, or putting logs across it, or ploughing over it, it is a nuisance. So if a ferry is erected so near an ancient ferry as to draw its custom away, etc.

In treating of public wrongs, the commentator speaks of common nuisances under chapter 13, Book 4, sec. 5: " Common nuisances are a species of offence against the public order and economical regimen of the State, being the doing of a thing to the annoyance of all the King's subjects, or the neglecting to do a thing which the common good requires." And therefore, he says, " they are indictable only, and not actionable, as it would be unreasonable to multiply suits, by giving every man a separate right of action, for what damnifies him in common only with the rest of his fellow subjects." Of this nature are, 1. Annoyances in highways and bridges and public rivers. 2. All those kinds of nuisances which, when injurious to a private man are actionable, are when detrimental to the public, punishable by public prosecutions, etc.

As to the remedies—the great remedy for private nuisance, is action on the case, by which the party recovers damages, but cannot thereby remove the nuisance.

Let us suppose that some citizen had brought an action against these Defendants, before these lands were drained, for damages, because of their being a nuisance, and, in addition, to have the nuisance abated, by draining them and cutting down the woods; on his part, he should bring witnesses to show the damage to his hereditaments; what progress could he have made. The defendants would have replied, that these lands are in the condition of nature; these forest trees, many of them, have stood where they now stand for a thousand years, long before the continent was discovered by Europeans; the waters have flowed or stood as they now do, beyond the memory of man. You say the waters are offensive and unwholesome; if so, it is not our fault. The waters that you see, fall from the clouds or flow up fresh from the lake, except such as drain over and through them from the city lying between them and the river. If they are poisoned at all, it is in part by your own fault and filth. Our lands do not drain on to yours, but yours drain on to ours Where is the limit to the injury? Here are something like two thousand acres of land; what part of it injures you, or does it all? If so, where will you stop, for these lands are but a fraction of the lands situated in like manner; on every side, except toward the river, they extend miles and miles away? Where are your authorities to support, or even to give countenance to your case? It what case has it been adjudged that parties owning a large body of lands, situated as these are, in the simple condition of nature, should pay damages to an individual on account of their being and remaining in such condition? or in what case have they been ordered to be

abated as a nuisance? If you have no adjudged case, where is your ordinance, either legislative, or municipal, declaring these 'lands a nuisance, and ordering the owners to drain them and cut down the woods? And if you have no adjudged case, nor ordinances, your case must fail; because " where there is no law there is no sin." The Attorney General, I take it, would have fared no better, had he framed an indictment against the defendants, on the ground of a public wrong.

I cannot, therefore, understand, how these defendants can be implicated in the way of police, in regard to the lands situated in the second section.

For, in matters of crime and police, the citizen is enjoined to do some particular thing, the neglect of which will subject him to an action for damages, or an indictment, or both, or else he is enjoined not to do some particular thing, which, if he does do, will subject him to like contingencies. Now, these defendants are not in either category. They have not been enjoined to do anything to these lands, or to refrain from doing anything whatsoever, by either State or municipal ordinances. Nor have these lands ever been declared a nuisance by any legislative or judicial decree—which would certainly be new and extraordinary if it had been done—for, as I have heretofore said, a nuisance is something brought about by the action of man, and not by the hand of the Creator. The only action taken by any department of the government in regard to these lands, is contained in the charter of this Company, by which it alone is authorized to drain them and cut down the woods. Therefore, it is clear, that defendants are not in default in any manner; that there is no law against them, and, therefore, that they cannot be made to suffer any *penalties or make any reimbursements.*

I do not deny that the power of government to drain these lands is properly placed, under the head of police. In truth, my. language upon the subject was, that " if there be authority at all existing in government, either State or municipal, to compel the owners of swamp lands to drain them, and to cut down the woods and timber which may be growing on them, it exists under the head of police.

But this is the first time that the learned counsel, to my knowledge, have placed it upon that ground. We heard nothing of it in the lower court, for the burthen of argument consisted in showing what great benefits this Company had conferred on the defendants. But it matters little about that—however it sounds a little strangely to hear one talk of police regulations, enforced in the way of penalties and damages to the parties, and at the same time of great benefits. I have never denied the right of the government to have these lands drained, etc., for the public welfare—but what I have denied is, that these few defendants can be compelled to pay the entire cost of it. I have never admitted that these defendants could have been compelled to do it; but I admit and contend that, if they could have been compelled to do it, it was under the police power of the government. But I say the government could not compel the owners to do it, or forfeit their property to the public. Such a decree from a government would not be legislation, but a species of judicial decree, and without warrant or parallel in legislation in free governments. The counsel ask, if the owner of a city lot, below the level of the city, could not be compelled to fill it up. I grant he could; but what similarity is there in the condition of this lot and these lands? None whatever. Not near so much as there is between this lot and any plantation along the coast; for they, are alike in this, that both have been taken out of the *condition of nature.* This lot has no longer its natural drainage, by means of the filling of the surrounding grounds. The city has the right—more, it is her duty, to look to the drainage of lots and streets as they are built upon; because the common welfare is concerned in it. But when has it happened that the owner of a lot so situated has been compelled to pay for the filling of it up, when done by the employees of the city government, when there was no ordinance ordering it to be done, and he had no notice to do it?

So it is in regard to making and repairing of levees, and building of frame houses within certain districts. There must be some law before there can be a default or penalty. I do not deny these great powers of government; and the learned counsel does me injustice in saying that I maintain " the unrestricted freedom of every citizen to do with his property just what he may think proper, except so far as restrained by the right of eminent domain and the taxing power."

My language at page 32 is, The owner of property has a right to use it in such manner as he pleases, so that he does not violate *such police regulations* as are made for the preservation of *good order and neighborhood.*

DRAINING Co.
PRAYING, &C.

But while I admit these powers, I claim an *equal* and just exercise of them. Government cannot say to you, fill up your lot, and to me, who have a lot alongside of it, you may let yours remain—to you, you cannot build a frame house at such a place, while it allows me to build one in close proximity to it. No one will probably deny this, yet why should inequality not exist in these matters, as well as in the payment of taxes?

It appears to me, that the State have taken the remedy in this matter into their own hands, and is in the condition put by Mr. Justice Blackstone, (if it be possible to implicate these defendants in this matter under head of Police, which I deny), when speaking of remedies, he says: "Also, if a man hath abated or removed a nuisance which offended him, (as we may remember it was stated in the first chapter of this book, that the party injured had a right to), in that case he is entitled to no action. For he had choice of two remedies: either without suit, by abating it himself, by his own mere act and authority, or by suit, in which he may both recover damages and remove it by the aid of the law; but having made his election of one remedy, he is totally precluded from the other."

There is another consideration which is alike fatal to the pretensions of this company. The company says that it was created under the police power of the government, and for police purposes. If it be so, how is it that the government could authorize this company to intermeddle with the police affairs of New Orleans, for the Constitution of 1812, and those which have succeeded it, have given the choice of police officers and agents to the citizens of New Orleans. Now if this company was chosen to exercise police functions within the limits of the city of New Orleans, it may properly be styled an officer of police—(its being a corporation can make no difference, for a corporation is simply a union of several persons, empowered by law, to act as one). Thus it will follow that such choice, and authorization on the part of the Legislature, was null and void, and the acts of said company, under their charter, so far as these defendants are concerned, are of no binding effect whatever; and it will not do to say, as in the language of the learned Judge who gave a dissenting opinion in this cause, that "the citizens of New Orleans have not been deprived, by these acts, of any of their rights, with regard to the election of public officers thus guaranteed to them." For it cannot be said that the citizens of New Orleans had anything to do in the choosing of this company, in the sense of the Constitution, and it will not vary the position, because the city owns a large portion of the stock, "and acquiesces in the constitutionality and binding force of the acts." The rights of individual citizens, under the Constitution, cannot be impaired by the action of the city in the premises.

Again, the charter of the company gives it the exclusive police power, (since you choose to call it so), in the premises—the exclusive right to drain the lands, and thereby remove the evils complained of—how can these defendants be charged with neglect in not having done—not only what there was no law requiring them to do, nor no notice given—but what the government has put it out of their power to do. These defendants cannot be made to pay damages and penalties under such circumstances—nor compelled to make reimbursements to another, for having done, under the authorization of government, what they, by the same instrument, were not permitted to do. Such a thing would be an anomaly in the history of the law—and too gross an outrage on the common sense of mankind to be for a moment tolerated.

But you will say—it has been said already—that the work could never have been done by the proprietors—and in this consideration, an apology is sought for the high handed usurpations of this charter. Of that, there is no proof—the evidence is the other way. For amongst the proprietors in this section, are *Madam Pontalba*, who the Counsel say, is a millionaire, *John McDonogh* and *L. Millaudon*, either of whom, could have done all the work which has been done, without great difficulty, and probably, at less than half the cost. At least, they would have saved themselves some $29,000 for salaries, and many other items. But besides these, there are very many of the defendants of abundant means, to have paid their quota. So, that this apology will not avail, and to have made it good, it would have been necessary to have given them the opportunity by law and notice, and thus have put them in default.

The learned Judge, who delivered a dissenting opinion in this case, can see no analogy in this case, and the case of *Fletcher* v. *Peck*, 4 Cranch, under the point I made—under that clause of the Constitution of the United States, which

declares that "no State shall pass any law impairing the obligation of contracts."

I did not state at any length the facts of the case cited, because, I supposed them familiar to the Court. I did not state that the lands in question, sold originally by the State of Georgia, had passed from the original grantees, to third parties, and that without any notice of fraud, or defect arising therefrom between the original parties. So, that the parties to the suit, stood before the court in regard to their rights, as if the State had never owned these lands. So, the court say, if the State can divest the title to these lands, and declare them vested in the State, it can do the same thing to other lands. The language of the court is : " Their situation was the same, their title was the same, with that of every other member of the community, who holds lands by regular conveyances from the original patentee."

The court say again, " it is not intended to speak with disrespect of the Legislature of Georgia, or of its acts. Far from it. The question is a general question, and is treated as one. For although such powerful objections to a legislative grant, as are alleged against this, may not again exist; yet, the principle on which alone this rescinding is to be supported, may be applied to every case to which it shall be the will of any Legislature to apply it. The principle is this : that a Legislature may, by its own act, divest the vested estate of any man whatever, for reasons which shall, by itself, be deemed sufficient."

Again, and in conclusion, the court say, " it is then the unanimous opinion of the court, that in this case, the estate passed into the hands of a purchaser for a valuable consideration, without notice, the State of Georgia was restrained, either by general principles, which are common to our free institutions, or by the particular provisions of the Constitution of the United States, from passing a law, whereby the estate of the plaintiff in the premises so purchased, could be constitutionally and legally improved, and rendered null and void.

There are two things to which I wish to call the attention of the court in these extracts—the first is, that the parties in the case cited, and the case before the court, are in similar position in regard to their titles to their land, and that if the government could divest the title in one case, it could do it in another, and *vice versa.* The second is, that the court rest their opinion on the " general principles which are common to our free institutions," as well as on " the particular provisions of the Constitution of the United States." So, that if this cause should not come within the provisions of the Constitution of the United States, technically speaking, it will be embraced by the "general principles which are common to our free institutions."

But you will say that we have not been divested of our lands, or title to them. Is not the mortgaging our lands for $80,000, divesting us of our title, or impairing it; if the mortgage is foreclosed, and the lands sold, will not our title be divested; or if it is not, will it not be because the mortgage is null. Will you say that this mortgage is made for our benefit, with the view to the improvement of these lands, that the government cannot do, nor is it set forth as the motive. Will you say that this was done in view of the public good—then you admit the fact, and it is this which brings this case again in contact with the case cited. The State of Georgia passed the Act to divest the title to the lands in question for the public account. Will it be said that the purpose of this charter was not to divest the defendants of the title to their lands; if that were not the purpose, it can make no difference if such may be the result, and the Legislature did not know, nor does this honorable court know, but that such may be the result. And such being the case, the government cannot make the experiment—it cannot make us run the hazard. But suppose, in the operation of this charter, only one-half or three-fourths of the land should be taken. Should the land be sold by the company, and it should bring more than enough to satisfy the company, would that alter the case at all. Is not the taking of one dollar's worth of this land a divesting or impairing our title; if it be not, how much will be ?

It is said that " the regularly constituted tribunals of the country, were required to protect the proprietor from extortion, as well to enforce the equitable right of the company to indemnity in case it succeeded in benefiting the proprietors.

It is true that provision is made in the charter of the company for the courts to do certain things for the benefit of the company—first, to have inscribed a mortgage in its favor, for such sum as the company might suggest to the court, on these lands of defendants. And second, at the monition of the company, to

enquire whether the company had completed the proposed work, and then to examine their accounts, and see if the money claimed had been expended. It could not inquire whether the defendants had been benefited in the improvement of their lands or not. The lands are bound for the money that has been expended, in case they have not been benefited one dollar, as much so as they would be if their value had been increased four-fold by the labors of the company. But such was the regard manifested in this charter for the rights of defendants, that they could have no suspensive appeal, but were bound to pay the judgment of the lower court. See amended charter, sec. 4.

Much is said of the reasonableness of the provisions of the charter; but the power of parties to contract cannot be measured by the equitable terms of the contract. If the government had the power to bind our property in its contract with the company at all, it could make a bad bargain for us, as well as a good one, and we should be equally bound by the one as the other. If it could allow the company $30 per month wages for its negroes, it could allow $100, and if it could allow 10 per cent. interest on the same, from the end of every month, it could allow 50 per cent., and the courts could not alter or change the terms—for the courts cannot make contracts, but only inquire what the contract is, and enforce its execution.

Therefore it is that the government in this matter has set in judgment in its own case. It has determined the public necessity and benefit in taking our lands, and at the same time the proper compensation to be made us—two things, as I have before said, no government pretending to be free and limited can do. I read from 2 Dallas, 310.

"Where is the security, where the inviolability of property, if the Legislature, by a private act affecting particular persons only, can take land from one citizen, who acquired it legally, and vest it in another?" The rights of private property are regulated, protected and governed by general, known and established laws, and decided upon by general, known and established tribunals; laws and tribunals not made and created on an instant of exigency; on an urgent emergency to serve a present turn of the interest of a moment. Their operation and influence are equal and universal—they press alike on all. Hence security and safety, tranquility and peace. One man is not afraid of another, and no man afraid of the Legislature. It is infinitely wiser and safer to risk some possible mischiefs than to invest in the Legislature so unnecessary, dangerous and enormous a power as that which has been exercised on the present occasion; a power that, according to the full extent of the argument, is boundless and omnipotent. For the Legislature judged of the necessity of the case, and also of the nature and value of the equivolent. Such a case of necessity, and judging too of the compensation, can never occur in any nation."

"Shame to American legislation! That in England, a limited monarchy, where there is no written Constitution, where the Parliament is omnipotent, and can mould the Constitution at pleasure, a more sacred regard should have been paid to property than in America, surrounded, as we are, with a blaze of political illumination, where the Legislatures are limited, where we have republican governments, and written Constitutions, by which the protection and enjoyment of property are rendered inviolable."

At a preceding page of my brief I remarked as follows: There are some things which cannot be done without a concert of action among a number of individuals, such as the opening of streets and highways, and the draining of swamp lands. It would be useless for one proprietor to open a road on his lands if it was not extended through those of his neighbors. So it would be useless for one to attempt to drain his land, when it was surrounded on all sides with other lands on the same level. But, owing to the ignorance of some, and the pertinacity of others, it is difficult to find any great number of individuals who will unite in a concert of action to accomplish any of these objects. To remedy this, the Legislature in most of the States, in regard to roads, and in Massachusetts and Connecticut in regard to swamp lands, have provided by statute that a majority, or a majority of two-thirds or three-fourths, shall control the action of the remaining minority. To this there can be no objection. It is perfectly in harmony with the rights of private property, which will be secure under such a procedure. It is leaving private rights to be controlled by those concerned, as much as the necessity of the case permits."

To this the learned and accomplished Judge, who delivered the dissenting opinion in this case, says: "But looking at it in the light of principle, it seems to

me that the legislation of those States is liable to all the objections, so far as
the dissenting minority are concerned, that are urged with so much vigor against
our own. If it is tyranny for the Legislature to do this thing, it is tyranny for
a majority of proprietors to do it, under legislative sanction."

These remarks by the learned Judge lead me to believe that I have not been
understood by him. For, to my judgment, the difference is very broad, and the
lines marked and distinct. In the case I put; the majority and minority stand
upon the same basis. The majority pay for the draining of their lands as well
as the minority, and in the same ratio. They have, therefore, a community of
interests; they are, to use a familiar expression, afloat in the same bottom.
They have as much a community of interests, and their rights are as well pro-
tected, and in a similar way, to those of the stockholders of any banking, or any
other like company, whose members vote according to the stock they hold.
And I still maintain that this is the proper and legitimate mode of opening
streets and paving them, etc., the proprietors paying the cost of them—but pro-
tecting the minority by a majority in property of three-fourths; and in cases
where the proprietors failed to act, and the public interests and necessities were
paramount—such as in opening great avenues through unpeopled districts, and
in draining neighboring low lands—the public at large should pay the entire
cost.

But how is it on the other side? Is there any community of interests be-
tween this company and these defendants? None. The interest of the com-
pany is to do as little work for their money as they can, to charge as many
days' wages as they can for their negroes, and to multiply offices for their
friends, and to give them as high salaries as possible, and for as long a time,
and, on all, to constantly add the highest interest.

Is there any community of interests on the part of the government and
State? Does the State pay anything? Does any one pay anything, of all those
who made this law to bind us defendants? No one. Is it said we are repre-
sented in the government? How much are we represented? What part of
one representative belongs to us? Not one one-hundredth part.

So we stand alone, powerless to help ourselves, against the whole power of
the State; and the government disposes of our property as though we were
slaves instead of freemen. On one side, therefore, there is freedom; and on
the other despotism. One is as Charles the First, gathering taxes under the
authorization of Parliament; and the other is Charles gathering taxes of his
own mere will and pleasure.

I have thus examined, in a loose and very imperfect manner, (for the time al-
lotted me has not been sufficient to properly digest and condense the argument)
the various questions which have arisen in this cause, and to answer as best I
could the points which have been raised by the learned and distinguished coun-
sel on behalf of the Draining Company. The case is important on account of
the large amount of property at stake, but more important far on account of
the principles involved.

Questions more grave and serious can hardly be found to occupy the atten-
tion of the court or commonwealth. In one view of the cause questions arise
of the power of government over the property of the citizen. Can government
take the property of the citizen except for a public purpose. Can it take it
except under the right to tax and the right of eminent domain, except it be for
crimes and misdemeanors, and in the way of penalties. Can it take it under
the right of eminent domain without making compensation. Can it determine
the necessity of taking it, and at the same time determine the amount of com-
pensation that shall be given for it. Can it vary the nature and character of
the compensation from the common, known and legitimate standard measure
of the value of property—to wit, money. And under the right to tax, can the
government place the whole burthen of the commonwealth upon one or certain
citizens—on property belonging to them—to the exemption of the same kind
of property in the hands of other citizens. Or can it lay the entire burthen of
taxation on one part of the State, city or parish. In one word, was the govern-
ment of Louisiana possessed of absolute and despotic power over the property
of the citizen, under the Constitution of 1812, and the Constitution of the
United States.

In another view—looking at it as a question of police—questions arise, can
the government make a citizen pay damages or penalties where he has violated

47

no law or ordinance, either by doing, or neglecting to do, anything prescribed; or can he be made to reimburse another for having done that something which there was no law requiring him to do—but, on the contrary, the only law made in regard to the subject matter prohibited him from doing it.

These questions stand like armed men in the way of the decision of this cause, and judgment cannot be attained to, without first disposing of some, or all of them.

If, in the decision of this cause, the government shall be confirmed in the great and transcendant powers claimed for it over private property, citizens will fear and distrust each other, and fear and distrust their government, because the way will be open to the intriguing, the avaricious and unscrupulous—to the accomplishing of their purposes, through municipal ordinances and legislative grants and charters. On the other hand, if the decision shall be against such pretensions, citizens will have faith in each other and faith in their government, because the rights of each will be protected by the common iterests of all.

I close this already too extended argument by reading a passage from Chief Justice Marshall, 571:

"We cannot resist the conclusion that it would be a violation of the general tenure and spirit of the Constitution for the Legislature to attempt to deprive any citizen of his property, without previously providing compensation therefor. And whenever such Acts are passed, we believe it to be the duty of the judiciary to disregard them and consider them as nullities. We cannot perceive any reason which shall compel the judiciary to obey a legislative Act, at war with the tenor of the Constitution, and the fundamental principles for the preservation of which the government was instituted, that would not apply with equal force to produce obedience to a legislative Act, directly opposed to any one of the positive inhibitions of the Constitution. We grant the representatives of the people are the shepherds of the flock; but they are not exclusively such, although vested with great and extensive powers. If, through inadvertence or design, they should endeavor to sacrifice any one or more as victims, it cannot be done, so long as the judiciary remain virtuous, intelligent and independent. Both departments must concur to work iniquity before the people can be made to mourn, and in bitterness to curse their government."

MERRICK, C. J. (BUCHANAN, J., dissenting.) The application of a few well known elementary principles ought, we think, to decide the principal question involved in this controversy.

The supreme authority in every state must have the power to provide for the general welfare of the inhabitants of such State. One of the main inducements for an organized society is the ability with which the collective power of the whole can be exerted on enterprizes beyond the individual capacity of its citizens.

By the common consent, it is the duty of the government to protect its soil from invasion. It is obliged to administer justice; to protect the inhabitants, as far as possible, from great calamities, such as the overflow of rivers, or the sea, or from famine; to provide for the general health by regulations to prevent the introduction and spread of plagues and contagious diseases, and to drain insalubrious marshes in the neighborhood of great cities, and to abate nuisances. In fine, it has the power, among other things, to adopt all laws and regulations calculated to advance the safety and prosperity of the people, whether it concerns its defence, its health, its commerce, its internal quiet and police.

The power which the State possesses is not wholly confided to the Legislature. A part of this power, guarded by the Constitution, sleeps in the arms of the people, from whence it can be called into activity only by a convention called by themselves. In all other respects the power of the legislative department of the government is supreme. Its only restriction is the Constitution.

The Legislature, therefore, had the power to create the New Orleans Drain-

ing Company, and to confer on it the powers specified in the charter, unless restricted by the Constitution.

If the Legislature had the power to drain the swamp in the rear of the city, directly or by its own agents, it had the power to do it through the intervention of a company created for that purpose.

But it is contended that the Constitution does restrict the legislative power in the very matter before us, and that the Articles of the Constitutions of 1845 and 1852, recited below, have the effect of abrogating the charter of the New Orleans Draining Company. The first, Art. 105 of the Constitution of 1852 and 109 of the Constitution of 1845, is in these words:

"No ex post facto law, nor any law impairing the obligation of contracts, shall be passed, nor vested rights be divested, unless for purposes of public utility and for adequate compensation previously made."

Art. 123 of Constitution of 1852 and Art. 127 of Constitution of 1845, reads as follows:

"Taxation shall be equal and uniform throughout the State. All property on which taxes may be levied in this State shall be taxed in proportion to its value, to be ascertained as directed by law. No one species of property shall be taxed higher than another species of property of equal value, on which taxes shall be levied. The Legislature shall have power to levy an income tax, and to tax all persons pursuing any occupation, trade or profession."

And Article 124 is in these words:

"The citizens of the city of New Orleans shall have the right of appointing the several public officers necessary for the administration of the police of said city, pursuant to the mode of elections which shall be prescribed by the Legislature; provided that the Mayor and Recorders, Aldermen and Assistant Aldermen, shall be commissioned by the Governor as Justices of Peace, and the Legislature may vest in them such criminal jurisdiction as may be necessary for the punishment of minor crimes and offences as the police and good order may require."

Let us consider the questions arising under these Articles. We will commence with the last Article.

If the draining of marshes or swamps was a matter of police, within the meaning and provisions of the Article 124 of the Constitution, there would be great force in the objection, for the power conferred upon the Draining Company is certainly more easily classed under the power of police than taxation, but it is not, we think, necessarily classed with either.

But whether referrible to that class of powers or not, we do not think it was embraced by the Article 124 of the Constitution, which was adopted for the purpose of guaranteeing to the city of New Orleans a form of city government and the election of its principal officers, and was not intended to direct the manner in which contractors for works of public improvement should be elected, nor to abrogate contracts already made. The language of the Article does not bear the broad construction contended for: it is only the "right of appointing the several *public* officers necessary for the administration of the police of said city." The kind of officers intended is shown by the proviso. The incorporated company taking a contract for the draining of a swamp cannot be called a public officer necessary for the administration of the police of said city.

We conclude, therefore, that Article 124 of the Constitution, independent of the rights reserved in the schedule, is not in conflict with the powers conferred

DRAINING CO.
PRAYING, &c.

upon the Draining Company, and if the charter of the company has been abrogated, it is by one of the other Articles specified. We will consider Art. 123 of Constitution of 1852, and Art. 127 of the Constitution of 1845.

If the Act incorporating the Draining Company is unconstitutional under Article 123, it is because the Act allows the company to assess upon the property of each person benefited by the draining of the section, his or her proportion of the cost of such work, and therefore it is the taxing of the property of those persons in the immediate vicinity of the work higher than others.

There are many burdens which are imposed by the State upon its citizens which are of necessity unequal, and which cannot be classed under the head of taxes.

Of this kind is the service which the able-bodied man is obliged to render the State, when he is summoned from his employments to attend military musters and drills, or when he is drafted to bear arms in defence of his country, and even labor on fortifications. It cannot be pretended that the small amount of pay which is given while in actual service is an *adequate compensation* to the business man and artizan who have perhaps left lucrative employments in order to serve the country.

In the country parishes the roads are worked by the able-bodied men. The poor man, who is compelled to work for his daily bread, is obliged to labor upon the road, while his rich old neighbor, whose wealth does not happen to consist in men-servants, is exempt from any contribution whatever. In one neighborhood the labor upon the roads may occupy but two or three days in the year; in another, those subject to road duty may be compelled to labor ten or twelve days. With reference to the State at large there is no equality in this.

Take, for example, the levees on our rivers and bayous. The common welfare requires that each proprietor should keep up the levee in front of his own plantation. The government, from which title to real estate under the theory of our laws, emanates, and by which each person who acquires it is guaranteed in the possession of his land, whether he is capable of actually occupying it or not, has the right to impose this condition upon every possessor of land. This, we presume, no one will question. But this service required from the front proprietors is often exceedingly onerous and unequal. One proprietor, whose lands are favorably situated, may be obliged to make his levee only of moderate height, and at a cost only of a few hundred dollars, while his neighbor, who possesses less land than he, may be obliged to expend several thousands. This is unequal, yet but few would pretend that it was unconstitutional, and we can see no injustice in the State when it says to each front proprietor: "You shall not be permitted to hold these lands unless you conform to the regulations which I prescribe, and on which the safety of others, as well as your own, depends."

Now, would it be unconstitutional if the Legislature, instead of compelling each proprietor to build the levee, should appoint some officer to make an exact estimate of the cost of the work on each plantation, and compel the owner to pay it to such officer to pay for the work to be done? We think not. This would be but interposing another agent to accomplish the same thing which is now done directly by the owner.

Other examples of the unequal impositions of the burdens of the government might be given, such as the grading of streets in cities, the paving of sidewalks, and the like, and the service of jurors, etc. Enough examples have

been given to show that it could not have been the intention of the people in convention to equalize these sort of burdens by Art. 123 of the Constitution.

What was intended to be remedied by this Article will be apparent by seeing how the taxes were levied for the support of the government at the time the Constitution of 1845 was adopted.

A certain sum was raised on lands, and this was arbitrarily apportioned by the Legislature among the different parishes.

Slaves were taxed one dollar each, whether worthless or valuable, old or young.

Horses and horned cattle were taxed so much per head. The billiard-table paid fifty dollars tax.

A tax of ten dollars (afterwards reduced to five) was levied on every four-wheel carriage. The costly carriage paid no more than the most plain and unpretending vehicle. It was to correct these evils in collecting the revenues for the purpose of the government that the Article was introduced into the Constitution, and it ought not to be extended to cases not within the mind of the law-giver when it was framed.

Assuming that the Legislature had the power to cause the swamps to be drained, we find nothing unconstitutional in the manner in which the cost of the work is to be reimbursed. It was within the power of the Legislature to require, if possible, the proprietors themselves of these marshy lands to drain them. It had the power also, for sufficient causes, of which the Legislature alone was the judge, to cause the work to be done and charged to the proprietors, respectively, and all this was not the levying of a tax in the sense of that word, as used in the Constitution. The money was not intended to go into the treasury and become subject to the rules by which alone it could be appropriated annually.

Having satisfied ourselves that the Constitution has not abrogated the charter of the Draining Company so far as it refers to the manner of assessing the cost of the work, we come now to consider how far it is affected by Art. 105 of the Constitution.

We have not understood from counsel that there are any cases in which the property has not been so far benefited by the work done, as to be increased in value more than the cost of the work assessed. Were not this the case, the property of each proprietor, to the extent of the difference between the increased value and the cost of the work assessed to him would be taken for a purpose of public utility without adequate compensation previously made, and consequently there would be a violation of the provisions of Article 105 of the Constitution.

There can be no question that the purposes and objects recited in the preamble of the Act of 1835, (see page 67) were clearly of such public utility as would justify the Legislature, if need be, to appropriate the land for the public benefit. And had any of the proprietors chosen to abandon their lots to the company, we would have directed an estimate of the value of these lots before they were drained, and this amount to be paid to the proprietor and the residue awarded the Draining Company to whom the lots were so abandoned.

But as no such complaint is made to us, we have no sufficient showing before us from which to infer that the property of any one of these proprietors will be taken for the public use without an adequate compensation.

See case of *Yeatmen* v. *Crandell*, 11 An., decided since the preceding portion of this opinion was prepared.

Having thus disposed of the main difficulty, let us proceed now to the consideration of the other questions presented by the parties on the re-hearing of this case.

1st. It is objected "That if the company can recover at all, it cannot recover more than the estimated cost, to-wit: $80,000; for that is the only legal lien upon the property in the second section. If it has expended more, it has done so without giving notice to the proprietors and the public, such as the charter contemplated, and as a consequence must suffer the loss."

An examination of the statute does not bear out the construction here contended for. It is true that the estimate of the probable cost of the work was required to be made previous to the commencement of the proceedings, to obtain the decree subjecting the property to the first mortgage and privilege in favor of the Draining Company, but this estimate formed no part of the decree itself. It stood in the same relation to the decree that the plan and statement of the probable duration of the work did. Even the plan was not required to be recorded in the registry of mortgages; a copy was required to be deposited only with the Recorder for *his information;* doubtless to facilitate him in making a certificate of mortgages.

It will appear by the eighteenth section of the Act of 1835 and the first section of the Act of 1839, amendatory thereof, that the intention of the Legislature was to give the Draining Company a superior mortgage and privilege upon the lands drained for the whole cost of the draining of the section.

By the first section of the Act of 1839 the Court were to decree "That each portion of the property situated within the said limits, is subject to a first mortgage and privilege in favor of said Draining Company for such amount as may be assessed on it for its proportion of the whole cost of the draining of the said section."

By the same section it was made the duty of the Recorder of Mortgages, whenever required to deliver a certificate of mortgages of any property embraced within the said section, " to mention therein that said property is subject to a privilege and first mortgage in favor of said Draining Company, for such a sum of money *as will hereafter* be assessed on said property for the draining thereof."

The same section of the Act continues, "The said privilege and first mortgage shall take precedence over all mortgages whatsoever, whether conventional, tacit, legal, or judicial, and shall attach to said property until the amount which will be assessed on *it,* and the notes which may be given for said amount, as provided in the 5th, 6th, 7th and 8th sections of this Act, shall have been paid in full."

The law does not require the *estimate* to be recorded in the office of the Register of Mortgages, and if it did, in reference to these provisions of law, we should be compelled to hold that it could have no more effect upon the privilege created in favor of the Draining Company, than the recording of the tutor's bond has on the extent of the tacit mortgage in favor of the minor. The statute did not require the decree to be recorded in the name of each proprietor in order to give it validity as a mortgage. The section to be drained was described, and the plan furnished the Recorder, with the subdivisions and names of the proprietors, as far as practicable. The statute was permissive to the Draining Company to record the decree against each, not imperative.

This view of the case disposes of the obligations of such opponents as have

become third possessors of the property during the progress of the work. They are purchasers with notice.

2d. But it is objected that the decree could not bind the holders of property in the section to be drained, because a notice published in the newspapers was not a notice to the proprietors. It is in the power of the Legislature to determine in what manner parties may be brought into court, and we have recently decided in regard to the city taxes, that a decree rendered upon such notice is obligatory. See *The City* v. *Cordeviolle & Lacroix*, 10th An., p. 732.

3d. It is further contended that the estimate made was not in conformity with the charter; that it was not intended as an estimate of the cost of a complete drainage, and, therefore, the company cannot recover. This objection is inconsistent with the objection that the estimate was binding on the company, and that they cannot recover beyond it. But if it were irregular, as alleged, the irregularity has been cured by a judgment of a competent tribunal, which has not only become final, but has been acquiesced in by these parties who have daily seen the work upon their land in progress, and who have made no objection or remonstrance.

4th. The next point is, "That the company cannot recover for any work or labor done or money expended on said Section No. 2, after the 1st of January, 1849, for then, according to their own showing, (by their own engineer) the draining of the section was completed, and ought to have been, according to the intent and meaning of the charter, turned over into the hands of the city."

The Judge of the lower court, after a careful examination of the testimony, came to the conclusion that the work ought to have been delivered to the city by the 10th of May, 1849, and ordered all charges after that date, whether occasioned by the crevasse or attributable to the remaining in possession after that day, such as charges for salaries, office hire, expenses for running the engines, &c., to be stricken from the account. The amount of these rejected charges, with two items withdrawn by the company, is $58,800 45.

The principle on which this large sum has been rejected is that the Act of 1839 required the Draining Company to proceed to the draining of the section with all possible expedition; that by the 10th of May, 1849, the work might have been completed and delivered to the city; that had it been so delivered, the loss occasioned by the crevasse would have fallen upon the city and not upon the Draining Company, and consequently the property holders.

It is by no means clear that the failure to deliver at that time, has not benefited the property holders by the more perfect condition in which the works were subsequently delivered, and that the facilities possessed by the Draining Company, during that time, to re-open the canals, did not contribute to an earlier possession of their property than would have been the case if this heavy labor had fallen upon the city.

Still the testimony gives rise to so much doubt that we do not feel authorized to disturb the judgment of the District Court in this respect.

5th. But whatever may be our views as to the rejection of the foregoing items, we think the District Judge erred in refusing, on the same grounds, to the Draining Company, interest on the sums of money expended by them previous to the 10th of May, 1849, during the period which intervened between that date and the surrendering of the section to the city on the 20th of January, 1851.

The statute gives the Draining Company interest on the money expended, and we know no principle upon which we can interfere with a right given by a statute on a subject entirely under the control of the Legislature.

The judgment must therefore be so amended, as to allow the Draining Company interest at the rate of ten per cent. per annum, on $191,504 28, from May 10, 1849, to January 20, 1851, to wit, $32,449 32.

6. It is further objected, that if the company was delayed and hindered in the prosecution of the work by want of means, that they cannot recover for any more than the work would have cost, if the company had ample means and good credit, and had pushed forward the work in an expeditious manner.

We do not discover such delay in the operations of the company, as to entitle the property holders to any further deduction, and it is by no means certain that the gradual manner in which the work was actually accomplished, was not less expensive than it would have been had a larger force and more expensive means been used at the commencement, and before the soil had acquired firmness by the joint action of the atmosphere and drainage.

7th. It is further objected, that section number two has never been completely isolated, and that it receives the drainage of all that portion of the city of New Orleans between St. Peter and Julia streets.

It could not have been in the contemplation of the Legislature to require the company to isolate the section from that portion of the city naturally draining on these inferior lands, which owed such servitude to the superior portions of the city. On the contrary, the object was to drain the inferior section, notwithstanding such additional labor imposed upon the company by throwing off the water falling upon a larger area.

8th. In regard to the rejection of the items of expense for the cutting of the wood and timber standing upon this section, we think there is no error in this part of the decree of the District Court. It was made the duty of the Draining Company to charge the expense of cutting, removing, and selling the timber to the proprietors of the "wooded land," and to credit them with the proceeds. Not having done so, the Draining Company cannot recover the cost of cutting the wood as a general charge against all the proprietors.

9th. The appellees further object, that the charge of interest up to the time of closing the general account and then charging of interest upon all the items, is interest upon interest, which is prohibited by law.

The anatocism results from the manner in which the company are directed to keep their accounts. By the second section of the Act of 1839, they were directed to open an account with the section of the swamp to be drained, and charge it with all the expenses incurred for the draining thereof, and it further provides that on every charge in said account, interest shall be calculated at the rate of ten per cent. per annum from the time it is made.

The third section provides, that as soon as the draining of the section is completed, the company shall make out a general account.

The fifth section of the Act provides, that the amount due upon each property for the draining thereof, as settled by the confirmed tableau, shall be payable in cash, with ten per cent. interest from the day in which the aforesaid account of the Draining Company shall have been closed.

We think these provisions fully justify the manner in which interest has been charged.

10th. In regard to the mode in which the assessment has been made, it is true the statute leaves great discretion in the appraisers, as respects the principles upon which their assessment is to be made. But this want of specific direction to these officers, does not render their acts void, or deprive the courts of power to approve such as they may think equitable and just. There is nothing in this record which satisfies us that the District Judge has adopted an erroneous basis upon which the assessment is directed to be made. We think it is supported by the testimony, or at least we have no data before us by which we could change it in one particular, with certainty that we were not doing a greater injustice to another class of the proprietors.

Whilst we feel the almost impossibility of doing exact justice among so many persons with conflicting interests, we are satisfied that whether we adopt the area or value of the lots, as the plan upon which the assessment is to be made, it will approximate the right so nearly,—that less injustice and injury will be done by adopting either, than by sending this case back for prolonged litigation and further proof upon this question.

The principal that it cost as much to drain one foot of land of little value as it did to drain an equal area of land more valuable, and that both were alike benefited, prevailed as to all the lands below the ordinary level of high water, in the lower court. This seems to be recognized by the third section of the Act of 1839,·which directed the appraisers in making the distribution, to take into consideration principally "the extent of the individual properties."

The large portion of the expenses which, by this view, is thrown upon the city for the streets, meets in some measure that equity which has been urged upon our consideration, that as this work has been undertaken for the public good, the public ought to bear the charge of it, notwithstanding the benefit to the owners of the soil.

It is therefore ordered, that the judgment of the Supreme Court heretofore rendered in this cause, be set aside and annulled. And it is now ordered, adjudged and decreed, that the judgment of the court below be avoided and reversed; and proceeding to pronounce such judgment as should have been rendered by the lower court, it is ordered, adjudged, and decreed, that the amended account D, filed on the 24th of February, 1854, be amended by adding thereto, as a credit to said New Orleans Draining Company, the sum of $32,449 32, on the interest account, and that said account thus amended, be homologated. And it is further ordered, adjudged and decreed, that the tableau marked A and B, filed on said 24th day of February, 1854, be also homologated, and the objection to said account D, and tableau A and B be overruled. And it is further ordered, adjudged and decreed, that there be judgment in favor of said New Orleans Draining Company, for the sum of $259,957 32, with ten per cent. interest per annum thereon, from the 10th day of January, 1851, until final payment, and that said New Orleans Draining Company recover said sum and interest by an assessment of four mills and 16,597–100,000ths of a mill, together with ten per cent. interest thereon, from 21st of January, 1851, on each superficial square foot of ground English measure, shown upon the plan book on file, excluding therefrom the portions of ground exempted from contribution, shown by said schedule A and B, and rating three superficial feet of high land as equivalent to one foot for the purpose of contribution, and that the payment of said contribution in principal and interest, be secured by a first mortgage and privilege upon the lands upon

48

which the same are assessed.   It is further ordered, adjudged and decreed, that the appellees pay the costs of the appeal.

SPOFFORD, J.   I concur in the decree.   For my views upon the constitutional questions, I refer to the dissenting opinion which I gave upon the former hearing of this cause.

BUCHANAN, J., dissenting.   I still adhere to the opinion, read in May last, as that of the majority of the court, in this case.

The court, as then constituted, held, that the forced contribution imposed upon the lands lying in the rear of the city of New Orleans, but within its municipal limits, and within the limits of the operations of the Draining Company, according to the Act of 20th March, 1839, and the Act of 19th March, 1835, for the purpose of defraying the expenses of the operations of said Draining Company, with interest, and various other charges in said Acts specified, was a violation of the 123d Article of the Constitution, inasmuch as the drainage of the swamps in the rear of New Orleans is a work tending to the salubrity and benefit of the *whole* city of New Orleans, and is declared by the preamble to the said Acts of the Legislature to have been undertaken with that view.   Further reflection has confirmed me in the correctness of the opinion thus expressed.

I will add that it appears to me no less clear, that the power conferred by the Act of 1839, upon the Draining Company, of assessing upon a portion of the lands embraced within the municipal limits of the city of New Orleans, a contribution for the reimbursement of expenses incurred for drainage, with interest, including the amount of contracts paid therefor, machinery, damages paid, labor of the company's slaves at thirty dollars per month each, and salaries of officers,—is, in fact, a power of taxation, which it is unconstitutional for the Legislature to delegate to a joint stock company, and is inconsistent with the taxing power vested in the municipal corporation by the various Acts incorporating the city of New Orleans, which are not repealed.

The inscription, by anticipation, of a mortgage and privilege for an undefined amount, in favor of the Draining Company, against each and every proprietor of land embraced within the company's operations, strikes me as amounting to a divestiture of vested rights, because it must render all property thus situated unsaleable, in the interval which elapses between the inscription of the decree creating the mortgage and privilege before the work is undertaken, and the homologation of the assessment and tableau of contribution after the work is completed.

The superiority which is given by the Act of 1839 to the mortgage and privilege of the Draining Company on the lands embraced in their operations, over all mortgages whatsoever, whether conventional, legal or judicial, is a provision divesting vested rights and impairing the obligation of contracts.

But this unconstitutional feature of the law, and the one immediately preceding, will be, perhaps, more properly examinable, when the consequences of the exorbitant privileges conferred upon the Draining Company shall be developed in their application to individual cases.